Andre Peter DUNN *v.* STATE of Arkansas

CR 07-96                                                   264 S.W.3d 504

Supreme Court of Arkansas
Opinion delivered October 4, 2007

*Gary McDonald* and *William A. McLean*, for appellant.

*Dustin McDaniel*, Att'y Gen., by: *Nicana C. Sherman*, Ass't Att'y Gen., for appellee.

Jim Hannah, Chief Justice. Appellant Andre Peter Dunn was convicted of first-degree murder and sentenced to a term of life imprisonment. For reversal, Dunn argues that the circuit court erred in finding that he lacked standing to object to a search of the decedent's apartment. He contends that the search violated his constitutional rights pursuant to the Fourth Amendment of the United States Constitution and article 2, § 15 of the Arkansas Constitution. Dunn also contends that the circuit court erred when it allowed into evidence results of luminol testing conducted at the apartment. Finally, Dunn argues that the circuit court erred in denying his motion for directed verdict because there was insufficient evidence at trial to support his conviction. As this is a criminal appeal in which a sentence of life imprisonment has been imposed, our jurisdiction is pursuant to Ark. Sup. Ct. R. 1-2(a)(2). We find no error and, accordingly, we affirm.

Dunn argues that there was insufficient evidence to sustain his conviction for first-degree murder. While the sufficiency-of-the-evidence argument was not Dunn's first point on appeal, due to double-jeopardy concerns, we review the issue before reaching other issues on appeal. *See Isom v. State*, 356 Ark. 156, 148 S.W.3d 257 (2004). In reviewing a challenge to the sufficiency of the evidence, we determine whether the verdict is supported by substantial evidence, direct or circumstantial. *Malone v. State*, 364 Ark. 256, 217 S.W.3d 810 (2005). Substantial evidence is that which is of sufficient force and character that it will, with reasonable certainty, compel a conclusion one way or the other, without resorting to speculation or conjecture. *Tillman v. State*, 364 Ark. 143, 217 S.W.3d 773 (2005).

Circumstantial evidence may constitute substantial evidence to support a conviction. *Ross v. State*, 346 Ark. 225, 57 S.W.3d 152 (2001). Guilt can be established without direct evidence and evidence of guilt is not less because it is circumstantial. *Id.* The longstanding rule in the use of circumstantial evidence is that, to be substantial, the evidence must exclude every other reasonable hypothesis than that of the guilt of the accused. *Id.* The question of whether the circumstantial evidence excludes every hypothesis consistent with innocence is for the jury to decide. *Id.* We will disturb the jury's determination only if the evidence did not meet

the required standards, leaving the jury to speculation and conjecture in reaching its verdict. *Brunson v. State*, 368 Ark. 313, 245 S.W.3d 132 (2006).

On November 23, 2003, Dunn placed a 911 call advising that he had found his girlfriend, Wandala Creer, dead in her apartment at 300 B Smith Street in Magnolia. Officers Mark Bridges and Michael Cauldwell of the Magnolia Police Department responded to the 911 call. When Bridges arrived, he was met outside the apartment by Dunn. Dunn told Bridges that he had used his key to unlock the door of the apartment, went inside, and found Creer's dead body on the couch. Dunn said he then covered Creer's body with a comforter. Bridges told Dunn to wait outside; then, Bridges entered the apartment and found Creer's body on the couch. Bridges observed what appeared to be blood stains on the wall near the couch, and he noticed that Creer had a large amount of blood around her throat area. Bridges and Cauldwell then walked through the apartment to make sure there was no one else inside who might be injured or deceased. Bridges stated that, at the time he and Cauldwell walked through the apartment, he did not consider Dunn a suspect; rather, he believed that Dunn was a "bereaved boyfriend."

Bridges asked Dunn if he would be willing to go to the police department and speak to a detective. Dunn agreed to go to the police station, and an officer transported him there. Dunn was not placed under arrest.

Meanwhile, officers led by Detective Todd Dew conducted a search of the apartment. Dew testified that he observed in the living room blood spatter on the walls, the ceiling, and the couch. He lifted the comforter from Creer's body and began taking photographs of the scene. In addition, officers dusted for fingerprints, took blood samples, and gathered other evidence from the scene.

After completing the crime-scene investigation, Dew went to the police department to speak to Dunn. In a taped statement, Dunn told Dew that he last saw Creer on a Friday evening, and that he had left the apartment after the two had an argument. Dunn said that he tried to call Creer sometime that weekend, but was unable to reach her. He said that he returned to the apartment Sunday morning to find Creer dead.

Dew stated that he asked Dunn if he could take his fingerprints for purposes of elimination. Dunn agreed, and during the fingerprinting process, Dunn told Dew that he needed to tell him

something. Dunn then admitted that he had actually found Creer's body on Friday night, rather than Sunday morning when he called the police. Dunn stated that he found Creer, touched her body, and went into the bathroom to wash his hands. He then retrieved some clothing and personal items from the apartment and left. Dunn told Dew repeatedly that he did not kill Creer.

Dew obtained a search warrant and returned to the apartment on November 24, the following day, for luminol testing to detect the presence of blood in the apartment that had been washed away or cleaned. Dew testified that his luminol testing in the bathroom showed areas consistent with the presence of blood on the floor, in the sink, on the wall behind the sink, and in the bathtub.

At trial, Dr. Charles Kokes, Chief Medical Examiner at the Arkansas State Crime Lab, testified that he had conducted the autopsy of Creer's body. He stated that the cause of death was based on both blunt-force injuries and sharp-force injuries. He testified that the blunt-force injuries consisted of a series of lacerations or tears in the skin on the back of her head, her forehead, the top of her head, and the right side of her head, with the majority of blows being to the left side of her head. One of the blows on the left side of Creer's head fractured her skull, causing hemorrhaging and bruising to her brain. The sharp-force injuries consisted of four stab wounds and cuts on the front of the neck. Dr. Kokes stated that one of these injuries was relatively larger and deeper than the others, extending deep into the musculature of the upper neck and extending internally across the base of the tongue. Dr. Kokes could not specify an exact time when death occurred, because of the intervening events before the autopsy, but stated that decomposition had begun. He determined that the manner of death was homicide.

Dunn testified at trial that most of the "disagreements" he and Creer had were about money. James Shaw testified that on Friday, November 21, 2003, he had gone next door to Creer's to return Dunn's cell phone, and that Dunn was present and commented that Creer "accused me of getting her money, [but] it's right there. Look. She's walking all over it," and put the money back on the coffee table. No testimony was presented about finding any money on the coffee table after Creer's body was discovered. Shaw also testified that, the same day, at Creer's apartment, he observed a metal pipe. Shaw stated that he believed he might have seen the pipe there prior to that day.

Shaw testified that he had borrowed Dunn's cell phone on Friday to call Nichole Hunter to pick him up and take him to the convenience store so he could get some cigarettes. He stated that it was getting dark when she got there to pick him up. Hunter testified that while she was waiting for Shaw in the parking lot about 5:45 p.m., she saw Dunn in Creer's ground-floor apartment, taking his shirt off, looking at it, then putting it back on, and acting fidgety. Hunter took Shaw to the store, and they returned a few minutes later, just before 6:00 p.m., and Hunter noticed that Creer's apartment door was closed and the lights were off.

Dunn admitted that he sometimes spent money on crack cocaine or marijuana. Frank Moss testified that he gave Dunn between $40 and $60 worth of crack on credit on Friday, November 21, 2003. He added that Jason Shepard was at his house when Dunn came to get the crack. Dunn admitted that he bought drugs from Moss, but he claimed that he had not gotten any the night Creer was murdered. Moss testified that he told Dunn that if he did not pay, he "was going to bust his mother fucking head." Shepard testified that he overheard Moss tell Dunn that something would happen to him if he did not have Moss's money. Shepard said that when Dunn returned to Moss's house later that night, he heard Dunn tell Moss, "[r]emember what you told me earlier about if I didn't have your money? I just had to do another mother fucker just the same way." Moss testified that when Dunn came over the second time that night, Dunn told him, "you know what you told me you were going to do to me . . . [w]ell shit, I just had to bust a some-bitch's head."

In his description of his relationship with Creer, Dunn alleged that she would frequently get drunk and fall asleep on the couch with the apartment door wide open and he would have to get her up and put her to bed. In contrast, Creer's mother testified that her daughter regularly slept on a couch instead of a bed and had done so for many years. She said that her daughter would never leave a front door open and would make sure that it was closed and locked.

Dunn contends that the circuit court erred when it failed to grant his motion for directed verdict because the State failed to present sufficient evidence to support a conviction for first-degree murder. Dunn argues that the State never produced a murder weapon, and that the testimony about a metal pipe proved nothing

other than a metal pipe may have been in the apartment. Further, he contends that the State failed to prove that he had any connection to the pipe.

Dunn also argues that there is no physical evidence tying him to the crime. Specifically, he states that his fingerprints were not found in the sink, where the State theorized there had been a cleanup of the crime scene, and he states that there was no DNA evidence that connected him to the crime scene. In addition, Dunn claims that those who testified that they heard Dunn talk about doing harm to Creer are not credible witnesses.

To prove murder in the first degree, the State must show that a person, with the purpose of causing the death of another person, the person caused the death of another person. Ark. Code Ann. § 5-10-102(a)(2) (Repl. 1997). A person acts purposely with respect to his conduct or a result thereof when it is his conscious object to engage in conduct of that nature or to cause such a result. Ark. Code Ann. § 5-2-202(1) (Repl. 1997). A person's intent or state of mind at the time of the offense is seldom apparent. *Wyles v. State*, 368 Ark. 646, 249 S.W.3d 782 (2007). However, a person is presumed to intend the natural and probable consequences of his or her actions. *Coggin v. State*, 356 Ark. 424, 156 S.W.3d 712 (2004). Because intent cannot be proven by direct evidence, the jurors are allowed to draw upon their common knowledge and experience to infer it from the circumstances. *Watson v. State*, 358 Ark. 212, 188 S.W.3d 921 (2004). Intent can be inferred from the type of weapon used, the manner of use, and the nature, extent, and location of the trauma suffered by the victim. *Harshaw v. State*, 348 Ark. 62, 71 S.W.3d 548 (2002).

The State contends that, beyond a reasonable doubt, the jury could conclude from the direct and circumstantial evidence adduced at trial that Dunn had the motive and the opportunity to kill Creer. We agree. Dunn had a key to the apartment, and he admitted that he was at the apartment on the evening of the murder. Testimony at trial revealed that Dunn purchased drugs that night from Frank Moss and told Moss that he had "bust[ed] a some-bitch's head." Shepard testified that he overheard Dunn tell Moss, "[r]emember what you told me earlier about if I didn't have your money? I just had to do another mother fucker just the same way." Dunn lied to the police during the investigation; he first said that he found Creer's body on Sunday morning prior to calling 911, but he later admitted that he saw Creer dead on Friday night.

■ We note that Dunn attempts to discount witness testimony by claiming that the witnesses are not credible. This court has repeatedly held that the weighing of evidence and witness credibility are matters left solely to the discretion of the jury. *Wyles, supra.* Dunn himself testified at trial, and some of his testimony was inconsistent with testimony from other trial witnesses. The jury may resolve questions of conflicting testimony and inconsistent evidence and may choose to believe the State's account of the facts rather than the defendant's. *Ross v. State,* 346 Ark. 225, 57 S.W.3d 152 (2001). Based upon the foregoing, we hold that there is substantial evidence to support a conviction for first-degree murder.

### Standing to Challenge Search

The circuit court concluded that Dunn lacked standing to challenge the search of the apartment and denied Dunn's motion to suppress evidence. In reviewing the denial of a motion to suppress, we conduct a de novo review based on the totality of the circumstances, giving due consideration to the findings of the trial judge. *See Blanchett v. State,* 368 Ark. 492, 247 S.W.3d 477 (2007). We will reverse a circuit court's ruling denying a motion to suppress only if the ruling is against the preponderance of the evidence. *See Hart v. State,* 368 Ark. 237, 244 S.W.3d 670 (2006).

We have recognized that, where the defendant owns or possesses the property searched, he or she has standing to challenge a search under the Fourth Amendment. *See, e.g., Mazepink v. State,* 336 Ark. 171, 987 S.W.2d 648 (1999); *Hodge v. State,* 332 Ark. 377, 965 S.W.2d 766 (1998). The defendant's rights are violated if the challenged conduct invaded his or her legitimate expectation of privacy. *See Davasher v. State,* 308 Ark. 154, 823 S.W.2d 863 (1992). A person's Fourth Amendment rights are not violated, however, by the introduction of damaging evidence secured by the search of a third person's premises or property. *Id.; Fernandez v. State,* 303 Ark. 230, 795 S.W.2d 52 (1990) (citing *Rakas v. Illinois,* 439 U.S. 128 (1978)).

At the suppression hearing, Dunn testified that he had a key to the apartment, given to him by Creer. Dunn stated that he had made phone calls about renting the apartment and filled out the rental application, but had not listed himself as the renter because he was not working at the time. He claimed that he lived there

with Creer at the time she was killed. However, on cross-examination, Dunn stated that he had moved most of his things out of the apartment one to two weeks prior to Creer's death because the two had a disagreement.

Dunn alleged that he and Creer had made up and that he intended to return. He claimed that he had stayed at the apartment with Creer since the time he moved out and had personal items in the apartment, such as houseshoes, deodorant, and underwear. The State avers that, whatever Dunn's alleged intent was does not matter because he also admitted that he had retrieved those few remaining belongings when he took them away with him on the day of the murder.

The circuit court concluded that, by Dunn's own admission, his role as occupant of the apartment had terminated one to two weeks before the death of Creer, and that Dunn failed to show that he had resumed the role of occupant. The credibility of witnesses who testify at a suppression hearing is for the trial judge to determine, and this court defers to the superior position of the trial judge in matters of credibility. *Baird v. State*, 357 Ark. 508, 182 S.W.3d 136 (2004).

In addition, Dunn made no showing that he had been an "overnight guest" in Creer's apartment at the time the search occurred. Dunn told the dispatcher and the responding officers that he had gone to the apartment Sunday morning and found Creer. Thus, by his own admission, he had not been an overnight guest at the time of the search. Therefore, unlike the accused in *Minnesota v. Olson*, 495 U.S. 91 (1990), Dunn had no reasonable expectation of privacy in Creer's apartment. *See, e.g., Marshall v. State*, 316 Ark. 753, 875 S.W.2d 814 (1994). In sum, Dunn failed to show that he owned, leased, or maintained control over the apartment. *Davasher, supra*. The proponent of a motion to suppress has the burden of showing that his own rights under the Fourth Amendment of the United States Constitution or article 2, § 15 of the Arkansas Constitution have been violated by the challenged search or seizure, and that has not occurred in this case. *See id.* We hold that the circuit court did not err in concluding that Dunn lacked standing to challenge the search of the apartment. Because we hold that Dunn lacked standing, we need not address his challenges to the circuit court's denial of his motion to suppress.

*Luminol Testing*

Dunn argues that the circuit court erred when it allowed into evidence the results of luminol testing. Prior to trial, Dunn filed a motion in limine to exclude the results of luminol testing and a motion to suppress any evidence obtained as a result of those tests, pursuant to this court's holding in *Brenk v. State*, 311 Ark. 579, 847 S.W.2d 1 (1993). In *Brenk*, we held that it was reversible error to admit evidence of luminol testing showing positive results for blood without also admitting evidence of follow-up tests confirming the presence of blood. Here, Detective Dew testified that the luminol testing showed positive results for blood on the bathtub plug lever, the soap dish on the wall, the bathtub wall, the floor in the area in front of the sink and toward the bathtub, the sink, the wall behind the sink, and the faucet knob and cap. Kermit Channel, with the Arkansas State Crime Lab, testified that DNA testing was done on the samples obtained from Creer, her shirt, the comforter covering her body, and a faucet knob, and that the testing he performed showed that the blood in all the samples was that of Creer.

Dunn argues that the State used a drop of blood found upon the faucet knob, which was confirmed to be Creer's blood, to justify the wholesale usage of other unconfirmed luminol testing. He states that lab confirmation of the presence of human blood on the faucet knob does not prove that the substances found in other areas of the bathroom were human blood or blood of any kind. Dunn contends that the evidence of the results of the luminol testing in this case gave the impression that there was a cleanup, which was highly prejudicial, making this evidence confusing and misleading to the jury.

In *Brenk*, luminol testing was done of appellant's trailer, his car, his van, and a building behind his trailer. At trial, a criminalist for the Arkansas State Crime Lab testified that the luminol testing revealed positive reactions for blood on the building, the trailer, and the car. We stated:

> In this case, very little additional testing was done to determine whether the substances causing the luminol reaction were human blood since a minute amount of blood was actually found. The only samples which could be found and which tested positive for human blood consisted of a small speck of blood found on the back of a kitchen drawer, and an area of blood about one millimeter square found on the inside of one of appellant's pairs of jeans. The

blood samples were so small that the testing could only establish that the sample tested was human blood and could not establish the blood type of the samples or connect the samples in any way with the victim, Lou Alice Brenk, or appellant. A bed sheet found in the bedroom of appellant's trailer tested positive for the presence of blood, but the results of the test used to establish whether blood is human were negative. Given the lack of follow-up testing, the results of the luminol test, which are presumptive only, had no probative value and did nothing to establish the likelihood of the presence of Lou Alice Brenk's blood, or even human blood, in the trailer, the block building, appellant's car, or on any of the other items tested where follow-up testing was not able to confirm the presence of human blood, much less blood of the same blood type as Lou Alice Brenk. *State v. Moody,* 573 A.2d 716 (Conn. 1990). Since we have determined that luminol tests done without follow-up procedures are unreliable to prove the presence of human blood or that the substance causing the reaction was related to the alleged crime, we find it was error for the trial court to admit the evidence of luminol testing done by Mr. Smith where there was no follow-up testing done to establish that the substance causing the luminol reaction was, in fact, human blood related to the alleged crime. *See Moody,* 573 A.2d 716 (Conn. 1990); *see also Lee v. State,* 545 N.E.2d 1085 (Ind. 1989); *cf. Commonwealth v. Yesilciman,* 550 N.E.2d 378 (Mass. 1990).

*Brenk v. State,* 311 Ark. at 593-94, 847 S.W.2d at 9.

In *Palmer v. State,* 315 Ark. 696, 870 S.W.2d 385 (1994), we held that it was error for the trial court to admit the evidence of luminol testing done by a criminologist from the State Crime Lab where there was no follow-up testing done to establish the substance causing the luminol reaction was, in fact, human blood related to the alleged crime. In that case, a forensic serologist testified that he had examined and tested four samples of wallpaper from the residence. On two samples he was able to identify human blood but not the blood type; on one sample he was able to detect blood but could not determine whether it was animal or human; in the remaining sample he could not identify blood of either kind. Tests on scrapings from appellant's vehicle were negative. The serologist later examined additional wallpaper samples from the appellant's residence and found no blood; these samples were submitted to the FBI and the report was negative. Based on our holding in *Brenk,* we reversed and remanded. *See Palmer, supra.* In *Young v. State,* 316 Ark. 225, 871 S.W.2d 373 (1994), we held that

it was error for the trial court to allow evidence of positive luminol test reactions on appellant's truck where follow-up tests from the State Crime Lab did not confirm the presence of human blood.

■ We believe that *Brenk* and its progeny are distinguishable from the instant case because in those cases either no follow-up testing was done, *see Brenk, supra,* or the follow-up testing that was conducted did not confirm the presence of human blood. *See Young, supra; Palmer, supra.* Here, there is no dispute that Dunn washed his hands in the bathroom sink and that luminol testing was conducted within two feet of the bathroom sink and within less than one foot above the bathroom sink. Testimony at trial revealed that human blood belonging to Creer had been identified in the immediate vicinity of the area where luminol testing was done. Dunn's testimony that he washed Creer's blood from his hands after touching her body connects the blood evidence directly to the crime. We conclude that adequate follow-up testing was conducted in this case. Accordingly, we hold that the circuit court did not err in denying Dunn's motion in limine to exclude results of luminol testing and motion to suppress any evidence obtained as a result of the testing.

### 4-3(h) Review

In compliance with Ark. Sup. Ct. R. 4-3(h), the record has been examined for all objections, motions, and requests made by either party that were decided adversely to Dunn, and no prejudicial error has been found.

Affirmed.