2010 Ark. App. 135

**Theodis Jordan SMITH, Appellant**

v.

**STATE of Arkansas, Appellee.**

**No. CA CR 09–787.**

Court of Appeals of Arkansas.

Feb. 11, 2010.

Rehearing Denied March 31, 2010.

Jerome "Jerry" E. Larkowski, Little Rock, for appellant.

Dustin McDaniel, Atty. Gen., Pamela Rumpz, Asst. Atty. Gen., Darnisa Johnson, Deputy Atty. Gen., for appellee.

DAVID M. GLOVER, Judge.

Appellant, Theodis Smith, was convicted by a jury of first-degree murder in the death of his three-year-old niece, L.D., who was living with appellant and his wife, Angela, in their home at the time of her death. He was sentenced to twenty-five years in prison. On appeal, he argues that the trial court erred in failing to grant his motions for directed verdict. We affirm the conviction.

### The Testimony

At trial, Kimberly Ratliff, a neighborhood friend, testified that on November 29, 2005, she went to appellant's home after lunch to visit Angela; that before she and Angela left to pick up their other children from school, Angela gave L.D. a bath and got her dressed; and that when they left around 2:30 p.m., L.D. remained at the house with appellant and she seemed to be doing fine. Ratliff said that on the way home, appellant called Angela and told her to come home. Angela dropped Ratliff off, but soon returned to Ratliff's home holding L.D. and telling Ratliff she needed help because L.D. was not breathing. Ratliff testified that at that time, she believed L.D. was still alive because when she began CPR efforts, there was a mucus-type substance coming out of L.D.'s mouth. According to Ratliff, she wrapped L.D. in towels from her dryer because L.D. was cool to her touch; then she and Angela took L.D. to the hospital. Ratliff testified that she never discussed what happened with Angela because Angela kept saying that she did not know what had happened.

Ratliff testified that while they were on the way to the hospital, she received a phone call from appellant, and she gave the phone to Angela, but she did not know what appellant said to Angela. Ratliff said that when they got to the hospital, L.D. was taken by hospital staff; that she and Angela were placed in a private room; that when the doctor came to see them, Angela did not tell him what had happened; but that Angela told the police officer who arrived at the hospital that L.D. had fallen off a trampoline and hurt herself. Ratliff said that she initially agreed with that story, but that she eventually told the officer that it was a lie. Ratliff learned that L.D. died while she was still at the hospital, but she said that she did not know what caused L.D.'s death.

Rachel West, another friend of the family, testified that she saw appellant and Angela about once a week. She said that on November 29, 2005, Angela called her about 2:30 p.m.; that she went to Angela's house about forty-five minutes later; that when she arrived, Angela was alone and

was upset and crying; that appellant drove up in his mother's vehicle; and that she noticed that Angela seemed to be more upset after appellant arrived. West testified that she did not speak to appellant as she left, but as she walked past him and Angela, she heard appellant tell Angela, "It's too late. She's already dead." According to West, when she walked by the car, she saw L.D. in the backseat, and it looked as though she was sleeping. West said that when appellant made the statement, he was acting "agitated," and she thought that he was just being cruel to Angela; however, she said that when she learned the next morning that L.D. had died, she went to the police department to give a statement.

Angela Smith's testimony differed in some respects from the testimony of Kimberly Ratliff and Rachel West. She stated that L.D. had lived with her and appellant off and on for about two months. She said that on November 29, 2005, Ratliff had come to her home before lunch; that L.D. was at the house during that time; that appellant was there sleeping; that before she and Ratliff left to pick up the children at school, she bathed and dressed L.D., woke appellant up, and left L.D. at the house with him; and that at that time, L.D. was playing and acting normal. She testified that while she was picking up the children, appellant called and told her to call his sister and to hurry up and get home. Angela said that when she arrived home, appellant was holding L.D.; that it appeared that L.D. had had a seizure; that L.D. was "out of it"; and that it was obvious that there was a problem. Angela stated that appellant did not say anything, but he put L.D. in the car. Angela denied that Rachel West had been in the house, and she denied that appellant told her that L.D. was dead or that it was "too late." Angela testified that appellant told her to take L.D. to the hospital, but he did not get in the car with her.

Angela also denied that she took L.D. into the Ratliff house, testifying instead that Ratliff came to the car and then took L.D. into the house. Next, Angela denied that Ratliff gave L.D. CPR, stating instead that she was the one who gave CPR and that Ratliff just sat there and let her choke on the way to the hospital. Angela denied that she told hospital personnel that L.D. had fallen off a trampoline, but instead told them that she thought L.D. was having a seizure. Angela further stated that she did not talk to appellant until she was already at the hospital, and she denied that appellant had told her what to say. Angela said that when she gave L.D. a bath, she was acting normal, and she did not notice bruises on L.D.'s body or face, only old welts on the back of her legs and a scratch on her back. Angela denied that she or appellant ever whipped L.D.

Randi Marshall, a certified nursing assistant, testified that she knew appellant and Angela Smith through Kim Ratliff, and that she knew L.D. from the times L.D. had been at Ratliff's house playing. On the day L.D. died, Marshall had gone to Ratliff's house to pick up her daughter; when she arrived, she saw L.D., saw that she was unconscious, and saw that her eyes were rolled back in her head. Though Marshall did not know whether L.D. was breathing, she stated that she told Angela and Ratliff that they needed to take her to the hospital. Marshall established that when she left the house, she saw appellant walking down the street, she asked him what was happening, and he responded that he did not know. Appellant asked to use her phone; she did not know who he was talking to on the phone, but she heard him ask "if she had called her mom and dad yet" and something to the effect of "did she say what I told her to

say" or "tell her to say what I told her to say." Then Marshall stated that appellant handed her phone back to her and continued walking down the street.

David Ellington, a Pine Bluff police officer, testified that he responded to a call on November 29, 2005, at Jefferson Regional Medical Center involving a child who had arrived at the hospital unconscious. Upon arrival, Ellington visited with Angela, who told him that she had taken the children to Ratliff's house and that L.D. had fallen outside and was not moving. Pine Bluff Police Sergeant Ricky Hill also responded to the hospital regarding the death of L.D. He said that he was told to go to appellant's house to look for where L.D. had supposedly fallen off a trampoline, but that he did not find a trampoline there.

Hill interviewed appellant at the police station regarding L.D.'s death. He said that appellant began the interview acting normal, but once the taped interview began, appellant's demeanor changed and he blurted out things like he had "f* * *ed up" and he had "done things that he can't fix." Hill specifically asked appellant about L.D., and appellant told him that he had whipped L.D. with a belt for wetting the bed; that she fell down on the floor; that he told her to get up and go take a shower; that after that, she came back and fell on the floor again; that she was having trouble breathing; and that when she did not get up off the floor, he scooped her up, put her in the car, and left. Hill recalled that appellant told him that he saw a state trooper, so he ran a red light, thinking that the trooper would pull him over and would help him; however, when the trooper did not pull him over, appellant turned around and drove back to the house. Hill testified that appellant said that L.D.'s breathing had changed at that point; that when he arrived at the house, he told Angela to call

someone for help; that Angela left with L.D.; and that he stayed at the house.

Sherry Wheeler, a registered nurse at Jefferson Regional Medical Center, testified that Angela told her that L.D. had collapsed outside while playing near a trampoline and would not get up, and when she checked on her, L.D. was not breathing. She said that Angela told her that she had tried to breathe for L.D.; that L.D. had coughed up mucus; that they tried to perform CPR on the way to the hospital; and that L.D. appeared to be choking on something. Wheeler testified that Angela said that L.D. was on no medication, had no medical history, and had no known allergies. Wheeler stated that she took this information to the ER physician. She also testified that a rape kit was collected for L.D., and that there were hairs in L.D.'s groin area that appeared to be pubic hairs, which were collected and placed in an envelope.

Dr. Janet Curry, the ER physician who attended L.D. on the date of her death, testified that when L.D. was brought in, she was in full arrest, meaning that she did not have an adequate heartbeat, did not have a pulse, was not breathing on her own, and was cold and blue. Dr. Curry testified that L.D.'s core temperature was 82.8 degrees, and that a normal core temperature would be about 99.6 degrees, which indicated that L.D. had been cold for a long period of time. Dr. Curry noted that L.D. had bruising around the lips; a hematoma above the right eye; semicircular injuries on her right forearm along with abrasions in that area; abrasions on the side of her neck; burns on her back that were mostly old and healing, but one with a small amount of abrasion; and an avulsion (missing tissue) just below the left great toe.

Once L.D.'s clothes were removed, Dr. Curry said that she noted hairs in L.D.'s

genital area, which she specifically identified as pubic hairs. Dr. Curry testified that she would not typically expect to find pubic hairs in the genital area of a three-year-old child. She noted that L.D.'s genital area appeared to be very damaged, with the skin rubbed off in places; abrasions to the anterior portion of the perineum; the vaginal opening significantly enlarged with bloody mucus material running out of it; and her rectal area appeared to be dilated. Dr. Curry testified that she performed a rape kit on L.D., including the collection of rectal and vaginal swabs, and the pubic hairs found on L.D.

Pine Bluff Police Department crime-scene technician Cathy Ruhl testified that she collected evidence from appellant's house after L.D.'s death, including a blue/green quilt and a blue/gray print comforter taken from L.D.'s bed, and a white down comforter from a mattress in the living room.

Edward Vollman, a forensic serologist at the state crime lab, testified that he did not find any semen on the vaginal or rectal slides and swabs, nor did he find semen on the perianal swabs, but that he did find semen on the pubic swabs, as well as on the blue/gray print comforter taken from L.D.'s bed. Vollman said that he found blood but no semen on the blue/green quilt taken from L.D.'s bed, and both blood and semen on the white down comforter taken from the living room.

Chantelle Taylor, a trace-evidence analyst at the state crime lab, testified that the hair found on L.D. was both head hair and pubic hair, that the head hair was microscopically similar to L.D.'s, and that the pubic hair was microscopically similar to the known pubic-hair sample of appellant.

Mary Robnett, the CODIS administrator for Arkansas and a DNA analyst at the state crime lab, testified that the semen stains found on the white down comforter and on the blue/gray print comforter taken from L.D.'s bed were from appellant, and that he was the only person in the world who could have that DNA profile. She said that the white down comforter had a mix of more than one individual's DNA on it, that appellant could not be excluded from that mixture, and that a Y-chromosomal DNA profile matched appellant, but that it was paternally related, so it would also match appellant's father or brothers. She said that there was semen on the pubis swab taken from L.D., but that the only DNA profile was consistent with L.D. She explained that sometimes with pubis swabs, the male DNA is masked and overpowered by the female DNA, and there is not enough male DNA to obtain a profile. Robnett stated that she was also able to obtain a partial Y-chromosome DNA profile from the pubic hair submitted in the rape kit, and it matched appellant's Y-chromosomal DNA profile, but that the Y-chromosome DNA profile would also be the same for his father or brothers.

Dr. Daniel Konzelmann, an associate medical examiner at the state crime lab, performed L.D.'s autopsy. During the autopsy, he noted multiple bruises, scrapes, and superficial cuts on L.D.'s face and neck area, including bruises across the right side of the forehead, on the right cheek, and on the left lower cheek and upper neck areas. He noted that upon reflecting the scalp, there were multiple bruises in the subcutaneous tissue that were not visible on the skin itself. There were scrapes and discolorations on the upper part of the thorax, as well as some older injuries that were healing. He found multiple scrapes, bruises and scars of varying shapes and sizes on the abdomen area, and the genitalia had what appeared to be a clear, dried stain over the pubis area. He stated that the mons overlying the upper part of the labia had a reddish

discoloration to them, and there were two small lacerations of the hymenal ring, an abrasion inside the labia minors, and multiple small punctuate hemorrhages surrounding the urethral orifice. He testified that when the hymenal ring is lacerated, it implied that there had been penetration, although he could not say by what. He also said that the abrasions of the inner labia indicated that something had been in that area, but he could not say what it was. He noted there were numerous nondescript scars on the front and back of L.D.'s thighs, as well as linear and curved discolorations over the lateral lower legs, thighs, and buttocks. There were two bruises over the back of the right lower leg that were visible on the skin's surface, as well as a bruise over the mid-left lower leg, an irregular large bruise over the front of the right thigh, and a bruise over the front of the right hip. Dr. Konzelmann found five bruises in the tissue covering the skull. He explained that in darkly pigmented children (L.D. was African–American), bruising of underlying tissue can be difficult to see on the skin, so in cases where abusive trauma is suspected, incisions are made in the arms, legs, belly, back, and buttocks to look for underlying injuries that are not obvious from the skin itself. According to Dr. Konzelmann, L.D.'s upper left arm, when incised, indicated bruising in the tissues underlying the skin, and it continued from the upper back of the arm to the lower part of the arm, where the bleeding extended into the muscle itself. He stated that the bruises were caused by a blunt-force type of injury, and that it required significant force. Pursuant to his examination, the upper right arm showed three areas of bruising, and the buttocks and lower back indicated extensive bruising, as well as the right lower leg, all consistent with blunt-force trauma. He said that these injuries were not typical injuries associated with parental discipline or falling off a trampoline one time.

Dr. Konzelmann also found that L.D. had suffered a closed-head injury; when he removed the skull cap, he found a thin subdural bleed over the surface of the brain, which indicated that a significant blow had occurred that ruptured blood vessels, and that L.D. had died before significant blood could collect in that area. He testified that he also found bleeding in the central brain spaces called the lateral ventricles, which are normally filled with clear spinal fluid, and he offered that this was from a significant blunt-force injury. He also found thin, black blood clots over the back of the right occipital brain lobe, which was another area of subdural bleeding.

It was Dr. Konzelmann's opinion that a child who suffered these blunt-force trauma injuries would not have been able to continue to play all day, that she would have become lethargic and eventually passed out. He said that the manner of death was a homicide, and that the cause of death was a closed-head injury, with a contributory cause of multiple recent and healed cutaneous injuries. He said that the head injury did not occur in a vacuum, and the number of injuries and the fact that some were recent and some were scarred was evidence that this was an ongoing process and not just a one-time incident. He was of the further opinion that his findings and the examination of her genitalia were consistent with sexual assault.

The State rested after Dr. Konzelmann's testimony. Appellant moved for a directed verdict, which was denied. Appellant recalled Ratliff to the stand to question her about whether she had a trampoline, to which she responded that she did. Appellant then rested and renewed his directed-verdict motion at the close of the evidence, which was again denied. Appellant now brings this appeal.

## The Sufficiency Arguments

Appellant argues that the trial court erred in denying his motions for a directed verdict. He argues that there was insufficient evidence linking him to the crime of murder in the first degree, and there was insufficient evidence that he was involved in the offense for which he was tried and convicted. We disagree.

A person commits first-degree murder if he knowingly causes the death of another person fourteen (14) years of age or younger at the time the murder was committed. Ark.Code Ann. § 5–10–102(a)(3) (Repl.2006). In reviewing a challenge to the sufficiency of the evidence, we determine whether the verdict is supported by substantial evidence, direct or circumstantial. *Dunn v. State*, 371 Ark. 140, 264 S.W.3d 504 (2007). Substantial evidence is that which is of sufficient force and character that it will, with reasonable certainty, compel a conclusion one way or the other, without resorting to speculation or conjecture. *Id.* Circumstantial evidence may constitute substantial evidence to support a conviction; guilt can be established without direct evidence, and evidence of guilt is not less because it is circumstantial. *Id.* For circumstantial evidence to be substantial, the evidence must exclude every other reasonable hypothesis than that of the guilt of the accused. *Id.* The question of whether the circumstantial evidence excludes every hypothesis consistent with innocence is for the jury to decide, and the jury's determination will not be disturbed unless the jury reached its verdict using speculation and conjecture. *Id.* The weighing of evidence and witness credibility are matters left solely to the discretion of the jury. *Id.*

Appellant argues that the State's case was premised on five points of evidence that do not link him to the crime: (1) semen collected from L.D.'s pubis; (2) semen found on the comforters at home; (3) a pubic hair found on L.D.'s genitalia; (4) a statement purportedly made by appellant that she [L.D.] was already dead; (5) and a second statement purportedly made by appellant to his wife to say what he told her to say.

Appellant first argues that the State was unable to prove that the semen on L.D.'s body was his semen. He also argues that the fact that semen was found on comforters located in his home proved nothing criminal. He then contends that the pubic hair matched either him or one of his paternally related male relatives, such as his father or his brothers, who could not be eliminated, and that the hair could have been transferred indirectly from any number of sources. He next contends that the statement that L.D. was already dead could have indicated that he believed her to be dead after witnessing a seizure, and that the statement did not connect him to the murder. Appellant finally argues that the statement that he told his wife to say what he told her to say did not link him to any crime, and that there was evidence that neither he nor his wife ever laid a hand on L.D. We find none of these arguments meritorious.

Angela had bathed and dressed L.D. right before she left to pick up the other children from school. Angela's testimony was that there were no bruises or scratches on L.D. except for some old welts on the back of her legs and one scratch on her back. L.D. was left in appellant's sole care, and according to Angela and Kim Ratliff, L.D. was fine when they left. Appellant called Angela while she was picking up the children and told her to hurry home, and L.D. was unconscious when she arrived. Rachel West testified that appellant was not at the house when she arrived, but came home soon after, and she heard appellant

tell Angela that it was too late, that she was already dead. West then saw L.D. in the back seat of the vehicle appellant was driving, and she was not moving. After L.D. had been taken to the hospital, appellant borrowed Randi Marshall's phone, and Marshall overheard him comment "tell her to say what I told her to say." Angela told people at the hospital that L.D. had fallen outside while on a trampoline, something that Angela denied saying.

L.D. was cold and blue upon her arrival at the ER, and she did not have a pulse and was not breathing on her own. Her low core temperature indicated that she had been cold for a long time. A rape kit indicated pubic hair on L.D.'s genitalia, and that pubic hair was found by Y-chromosome profiling to match appellant and any of his paternally related male relatives. However, there was no testimony that appellant's father or his brothers had been around L.D. Furthermore, L.D. had taken a shower right before Angela left her with appellant, and the pubic hair was found on L.D.'s genitalia. Semen was found on the swab from L.D.'s pubis; while it was not conclusively matched to appellant, again, L.D. had just taken a shower right before being left alone with appellant. Furthermore, appellant's semen had been found on a comforter on L.D.'s bed.

The trauma to L.D.'s body was immense, including both new and old injuries. The medical examiner testified that L.D. could not have sustained such blunt-force trauma injuries and continued to play like a normal child, that she would have become lethargic and passed out. The medical examiner was also of the opinion that L.D. had been sexually assaulted.

Furthermore, upon being questioned at the police station, appellant became agitated and nervous and stated that he had "f***ed up" and "done things he could not fix." He admitted that he had whipped L.D. with a belt for wetting the bed and that she had fallen down and had trouble breathing. Although he said that he put L.D. in the car and had gone for help, he turned around and went home again, and Angela was the person who took L.D. for help.

A jury need not lay aside its common sense in evaluating the ordinary affairs of life, and it may infer a defendant's guilt from improbable explanations of incriminating conduct. *Burley v. State*, 348 Ark. 422, 73 S.W.3d 600 (2002). While all of this evidence is circumstantial, taken together it constitutes substantial evidence that appellant was the person who killed L.D. *See Burley, supra* (sufficient evidence that appellant committed second-degree murder when she was sole care giver of child during time injuries were inflicted).

*The "Other Causes" Argument*

Appellant further argues that there are other causes that could have led to L.D.'s injuries, such as falling on her own; suffering previous seizures and a seizure on the day in question; falling from a trampoline; and rough-housing with her brother. We need not address these multiple contentions, as appellant never made this argument below and it is therefore not preserved for appeal. *Stone v. State*, 371 Ark. 78, 263 S.W.3d 553 (2007). Furthermore, appellant's attorney conceded during his directed-verdict motion that the State showed ample proof that L.D. "died from blunt-force trauma caused by another person." Appellant cannot now argue in good faith that L.D. died from an accident or other cause.

Affirmed.

GRUBER and BROWN, JJ., agree.