Cite as 2022 Ark. App. 516

# ARKANSAS COURT OF APPEALS

DIVISION II
No. CR-22-83

| | | |
|---|---|---|
| JAY PARKER | | Opinion Delivered December 14, 2022 |
| | APPELLANT | APPEAL FROM THE SCOTT COUNTY CIRCUIT COURT [NO. 64CV-19-85] |
| V. | | |
| STATE OF ARKANSAS | | HONORABLE JERRY DON RAMEY, JUDGE |
| | APPELLEE | |
| | | AFFIRMED |

## MIKE MURPHY, Judge

Appellant Jay Parker appeals the verdict of the Scott County jury finding him guilty of two counts of theft and one count of cruelty to animals and sentencing him to six years in the Arkansas Department of Correction. His arguments on appeal could be generally described as challenges to the sufficiency of the evidence and assertions of prejudice due to the charging information and an issue with an alternate juror. [1] We affirm.

At trial, Dr. Robert Cobb, a retired veterinarian, and co-owner of Sprayberry CGC, Incorporated (Sprayberry), testified that in December 2017, Sprayberry and Parker entered into a cattle-care contract whereby Sprayberry would pay Parker to care for Sprayberry's cattle. The contract contemplated that Sprayberry would entrust 337 bred cows to Parker's care and

---

[1]But for the State's brief, this case would likely have been sent back for rebriefing.

management. Under the agreement, Sprayberry would pay Parker $425 per cow per year, and in turn, Parker would ensure that the needs of the cattle were met. The contract specifically provided that Parker's cattle company "will pay for all feed, water, mineral, labor, lick supplements, medicine, dewormer and vaccinations (except for vaccinations given to calves at weaning." Parker was also responsible for supplemental rations as needed to maintain a good body condition on all the animals. Calves were to be weaned at five hundred pounds and cared for until ready to market at approximately six hundred pounds. The agreement further provided that if more than 2 percent of the cattle died, Parker would compensate Sprayberry for the loss. Sprayberry was to "be notified in every death loss by phone, text, or email."

Dr. Cobb testified that in December 2017, Sprayberry shipped 337 healthy bred cows to Parker and paid Parker a total of $75,825 for the first year of the contract. He said nothing in the contract allowed Parker to sell the cattle. At Parker's behest, Sprayberry purchased ninety-six more cows around March 2018 and compensated Parker for their care as well. Around the same time, Sprayberry was getting concerned with the lack of communication from Parker. He sent his father-in-law to check on the cows and was told they were not looking good and had lost a lot of weight. Sprayberry opted to wean the calves four months early. He said he contacted Parker with his concerns about their weight and Parker promised to get them more hay and feed. Sprayberry learned the cattle were "declining fast" in October 2018, so the co-owners decided to move the cattle. When they arrived to move the cattle, there were 112 cows, and 257 calves were missing. The remaining animals were weak,

malnourished, and in very bad shape. Some died during the move. Dr. Cobb said that, in total, over 60 percent of the calves and 46 percent of the cows died or were missing.

Bart Perrier, a special ranger with the Texas and Southwestern Cattle Raisers Association, testified that he assisted with a criminal investigation involving Parker. Throughout the investigation, he learned Parker had sold eighty-three cattle at livestock auctions in Oklahoma and Texas. During an interview with Parker, Parker admitted he had sold Sprayberry's cattle without permission but had used the money from Sprayberry to pay personal bills and therefore had no money left over to care for the cattle. Parker admitted overgrazing the property. Perrier testified that Parker admitted selling the cattle and pocketing the money. A recorded portion of Parker's statement to Perrier was played for the juryin which Parker admitted selling over $72,000 of Sprayberry cattle. He said the physical condition of the cattle was due do his poor management. He said that thirty to seventy cows had died.

Officer Billy Black with the Arkansas Department of Agriculture also worked on the investigation. He said that through investigating, after accounting for the cattle recovered and sold, they presumed 286 animals to be dead. Officer Black visited the pasture where the cattle were kept and observed and photographed dead cattle in various stages of decomposition. Those photos were entered into evidence. He said the cattle were trying to eat cedar trees in order to stay alive; they were not taken care of at all.

Brenda Abbott, a neighbor, had fifty to sixty cattle on her own property but lost only one calf to pneumonia that year. She watched the Sprayberry cattle deteriorating. She said

she did not have any problems with drought or dry grass but that if there had not been enough grass, she would have fed them, provided them hay, or started selling her older animals.

The jury found Parker guilty of two counts of theft of leased, rented, or entrusted property with a value of $25,000 or more and one count of cruelty to animals. Parker now appeals.

For the sake of clarity and constitutionality, Parker's arguments are summarized and addressed out of order. We address sufficiency-of-the-evidence questions first because if the judgment of conviction is not supported by substantial evidence, an appellant may not be tried again under the principle of double jeopardy. *Brown v. State*, 347 Ark. 308, 314, 65 S.W.3d 394, 397–98 (2001). Throughout Parker's brief, he makes points that tend to go to the sufficiency of the evidence. His second point can best be couched as an assertion that the circuit court erred in denying his motion for directed verdict due to the existence of a contract between the parties that contemplated the acts for which Parker is charged. He contends that the charges against him are no more than a civil breach-of-contract issue, and are misplaced in a criminal setting. He argues that the  the contract supports the position that he lacked the requisite mental culpability to support the charges.[2]

A motion for a directed verdict is a challenge to the sufficiency of the evidence. *Akram v. State*, 2018 Ark. App. 504, at 1, 560 S.W.3d 509, 511. In reviewing a challenge to the

---

[2]This is a generous summary of Parker's arguments—not one criminal case was cited in his opening brief.

sufficiency of the evidence, the appellate court views the evidence in the light most favorable to the State and considers only the evidence that supports the verdict. *Collins v. State*, 2021 Ark. 35, at 4, 617 S.W.3d 701, 704. We will affirm the conviction if substantial evidence supports it. *Shelton v. State*, 2017 Ark. App. 195, at 3, 517 S.W.3d 461, 463. Substantial evidence is that which is of sufficient force and character that it will, with reasonable certainty, compel a conclusion without resort to speculation or conjecture.

Additionally, circumstantial evidence may provide a basis to support a conviction, but it must be consistent with the defendant's guilt and inconsistent with any other reasonable hypothesis. *Collins*, 2021 Ark. 35, at 4, 617 S.W.3d at 704. Whether the evidence excludes every other reasonable hypothesis is for the jury to decide. *Dunn v. State*, 371 Ark. 140, 142, 264 S.W.3d 504, 506 (2007). A criminal defendant's intent or state of mind is seldom capable of proof by direct evidence and usually must be inferred from the circumstances of the crime. *Drennan v. State*, 2018 Ark. 328, at 7, 559 S.W.3d 262, 266. Further, the weight of the evidence and the credibility of the witnesses are matters for the fact-finder. *Jimmerson v. State*, 2019 Ark. App. 578, at 6–7, 590 S.W.3d 764, 769.

> A person commits the offense of theft of leased, rented, or entrusted property if he
>
> [p]urposely, with a purpose to defraud, or by false pretense takes, carries, leads, drives away, destroys, sells, secretes, converts, or appropriates in any wrongful manner any personal property of another person that is leased, rented, or entrusted to the actor; or [f]alsely reports of his . . . wealth or mercantile credit and by false report fraudulently obtains possession of personal property or the labor or service of another person.

Ark. Code Ann. § 5-36-115(a)(1)–(2) (Supp. 2021).

"A person acts purposely with respect to his or her conduct or the result of his or her conduct when it is the person's conscious object to engage in conduct of that nature or to cause the result." Ark. Code Ann. § 5-2-202(1) (Repl. 2013). The offense of theft of leased, rented, or entrusted property is a Class B felony if the value of the property, service, or labor is $25,000 or more." Ark. Code Ann. § 5-36-115(g)(1)(A).

A person commits the offense of cruelty to animals if he knowingly subjects any animal to cruel mistreatment, kills or injures any animal owned by another person without legal privilege or consent of the owner, abandons an animal at a location without providing for the animal's continued care, fails to supply an animal in his custody with a sufficient quantity of wholesome food and water, fails to provide an animal in his custody with adequate shelter that is consistent with the breed, species, and type of animal, or carries or causes to be carried in or upon any motorized vehicle or boat an animal in a cruel or inhumane manner. Ark. Code Ann. § 5-62-103(a) (Repl. 2016). A person acts knowingly with respect to his conduct or the attendant circumstances when he is aware that his conduct is of that nature or that the attendant circumstances exist; or when he is aware that it is practically certain that his conduct will cause the result. Ark. Code Ann. § 5-2-202(2).

Substantial evidence supports Parker's convictions for both theft of leased, rented, or entrusted property and cruelty to animals. Parker admitted that Sprayberry had entrusted him with its cattle and that Sprayberry also had entrusted him with money to care for the cattle—nearly $80,000—before the cattle even arrived at his property. He also admitted that

6

he knew he was supposed to use that money to feed and care for Sprayberry's cattle but did not.

Additionally, he admitted that he did not have Sprayberry's permission to sell the cattle, but he sold the cattle anyway, beginning only a month after he had misappropriated the nearly $80,000 Sprayberry had entrusted to him, upfront, to care for the cattle because he needed money. Moreover, on the same day Parker sold some of Sprayberry's cattle because he had no money to feed them, he falsely stated to Sprayberry that he could handle more cattle, deceptively convincing Sprayberry to give him even more money to purchase and care for more cows. Parker further admitted selling over $72,000 of Sprayberry cattle without permission.

Parker insists the contract between him and Sprayberry dictates the outcome of his case. He contends that his behavior was contemplated under the contract and, at most, there was a civil issue between the parties. That, however, was for the jury to determine. Whether the evidence excludes every other reasonable hypothesis is for the jury to decide. *Dunn, supra.* The trier of fact is free to believe all or part of any witness's testimony and may resolve questions of inconsistent evidence. *Colen v. State*, 2022 Ark. App. 148, at 5–6, 643 S.W.3d 274, 279.

Evidence also supports the cruelty-to-animals offense. Parker argues that because the State did not test the bones, the evidence could not conclusively point to him as the cause of the animals' death. However, Dr. Cobb said that when he went to retrieve the cattle, the ones that were still alive were weak, malnourished, and in very bad shape. Some died while

being relocated. Parker testified that the physical condition of the cattle was due to his poor management and thirty to seventy cows died. Parker, at a minimum, knowingly failed to provide sufficient food and water for the animals in his custody.

Parker's remaining two arguments are procedural in nature. Of the two, the first was that he was not "charged under the appropriate section" of the theft-of-property statute. He says that the offense with which he was charged "created bias." Appellants, however, do not dictate the charges filed against them. Such authority belongs solely to the prosecutor. Ark. Const. amend. 21, § 1; *Simpson v. State*, 310 Ark. 493, 497, 837 S.W.2d 475, 478 (1992). To the extent his argument suggests the jury should have been instructed on the lesser-included offenses, Parker did not ask for or proffer any jury instructions on the matter. *Williams v. State*, 2017 Ark. App. 198, at 8, 517 S.W.3d 446, 450–51. In *Williams*, we wrote:

> [I]t is well established that one requesting a jury instruction must prepare and submit to the court a correct instruction, and where he fails to do so, he is in no position to argue on appeal that the request should have been granted. The failure to proffer . . . the proposed instruction precludes this court from considering the issue on appeal. Appellant never obtained a ruling on this jury instruction issue and failed to proffer the jury instruction, therefore, this court is precluded from hearing this argument.

Parker's final procedural argument is that he was prejudiced by the circuit court's alternate-juror substitution after it released one juror for medical reasons during the jury's deliberations. He claims the jury failed to follow the circuit court's instructions "to start deliberations anew" after the substitution. Parker did not object to the alternate-juror substitution, nor did he raise any argument regarding the jury's alleged failure to follow the

8

circuit court's instructions.He did not move for a new trial; thus, this issue is not preserved for review. *See, e.g.*, *Carter v. State*, 324 Ark. 395, 403–04, 921 S.W.2d 924, 928 (1996).

Affirmed.

ABRAMSON and GLADWIN, JJ., agree.

*Caddell Reynolds, P.A.*, by: *Blake A. Ray*, for appellant.

*Leslie Rutledge*, Att'y Gen., by: *Rachel Kemp*, Sr. Ass't Att'y Gen., for appellee.