Cite as 2024 Ark. App. 586

# ARKANSAS COURT OF APPEALS

DIVISION II

No. CR-24-207

| | |
|---|---|
| CRISTA ANN STEADMON | **Opinion Delivered** November 20, 2024 |
| APPELLANT | APPEAL FROM THE ASHLEY COUNTY CIRCUIT COURT [NO. 02CR-23-109] |
| V. | |
| STATE OF ARKANSAS | HONORABLE ROBERT B. GIBSON III, JUDGE |
| APPELLEE | AFFIRMED |

### WAYMOND M. BROWN, Judge

An Ashley County Circuit Court jury found appellant Crista Steadmon guilty of possession of a firearm by certain persons—prior violent crime, a Class B felony, in violation of Arkansas Code Annotated section 5-73-103(c)(1).[1] In an order filed on February 1, 2024, Steadmon was sentenced as a habitual offender to a term of eight years' incarceration in the Arkansas Division of Correction and ordered to pay a $7,000 fine. On appeal, Steadmon argues that there was insufficient evidence to prove that she possessed a firearm. We affirm.

On May 11, 2023, at the request of Steadmon's mother, Ashley County Sheriff's Office was dispatched to 622 Ashley 35, Wilmot, Arkansas, to conduct a welfare check. Robert O'Neal, the homeowner, denied officers permission to search the residence. However, because Steadmon signed a probation search waiver for that address and the address was listed on Steadmon's driver's license

---

[1](Supp. 2023).

as her home address, officers performed a search of the house. During the welfare check and search, officers located Steadmon in a room attached to the carport; firearms were also discovered in the residence. Steadmon, who had an active warrant for her arrest, was taken into custody and subsequently charged with possession of a firearm by certain persons.

At the January 31, 2024, jury trial, the parties stipulated that Steadmon is a convicted felon. Chief Christopher Riordan testified that on May 11, 2023, he was dispatched to a Wilmot residence in reference to a welfare concern. Ann Standridge, Steadmon's mother, requested a welfare check on Steadmon because she had been unable to contact her and knew that she had been in an altercation with her boyfriend, O'Neal, earlier in the day. Chief Riordan testified that when he first arrived at the house, it appeared that no one was home, and no one answered his knock at the door. Shortly after exiting the driveway, Chief Riordan saw a black Chevy Silverado truck pull into the driveway of the residence. He stated that he recognized the truck as belonging to Robert O'Neal. Chief Riordan pulled back into the driveway behind O'Neal. When asked about Steadmon, O'Neal said that she had left and gone to Stuttgart the previous night; he stated that she was not at the home and refused permission to search the residence.

Chief Riordan testified that while still at the residence, law enforcement "pinged" Steadmon's cellular phone to get an idea of its general location; it pinged in the Wilmot area. He testified that he then learned that Steadmon's driver's license listed the Wilmot address as her residence. Chief Riordan was further informed that Steadmon was on probation, had a warrant for her arrest, and her

2

signed search waiver[2] was registered for the same Wilmot address; consequently, officers searched the residence.

Chief Riordan testified to the details of the search; bodycam footage of the search was also played in court. He stated that during the search, three operable firearms were found in plain sight; two were on the kitchen table and another one was on a wall gun rack in the room where Steadmon was found. Chief Riordan testified that women's clothing and purses were inside the house and in what appeared to be the master bedroom.

After completing the search of the main part of the house, officers turned their attention to a room attached to the carport where O'Neal had been prior to the search. O'Neal referred to it as his wood shop. The door was locked, and despite having just been in the wood shop, O'Neal stated that there was no key. Chief Riordan stated that upon making forced entry into the locked room, officers encountered Steadmon. She was informed that she was under arrest for an outstanding warrant. Steadmon requested to "go to the bathroom," stating that she had defecated on herself. Steadmon was permitted to go into the residence and change clothes.

Chief Riordan testified that in the room where Steadmon had been hiding, there was a security system and monitor surveilling the front of the residence and displaying the police vehicles and lights in the driveway. There was also a bed in the room. On a gun rack located on the wall were two unsecured firearms; only one was operable.

---

[2]Steadmon's search waiver provided, "As a condition of my supervised parole or probation, I agree to allow any Arkansas Community Correction officer, or any certified law enforcement officer, to conduct a warrantless search of my person, place of residence, or motor vehicle at any time, day or night, whenever requested by the Arkansas Community Correction officer, or certified law enforcement officer."

On cross-examination, Chief Riordan agreed that the address listed on a person's driver's license does not always accurately reflect the person's residence because "people do move." He testified that he initially thought she had an active probation-violation warrant for absconding; instead, she had an arrest warrant in Pulaski County. Chief Riordan stated that he did not see Steadmon go into the main residence where two firearms were in plain sight on the kitchen table; he saw her only in the wood shop where she was found. He testified that no mail was discovered with Steadmon's name or mailing address; women's "belongings" were inside the home, but he could not definitively state they were Steadmon's; and O'Neal said the firearms belonged to him.

On redirect, Chief Riordan testified that Steadmon's wallet containing her driver's license listing the Wilmot address was found in the wood shop where Steadmon was discovered.

Deputy Jared Moffatt testified next. He stated that he responded to the residence following a welfare-concern call. He said that he saw two firearms in the kitchen on the dining room table. Deputy Moffatt testified that he saw O'Neal exit a room connected to the carport, separate from the main house; however, O'Neal claimed that the door to the room was locked. He stated that Chief Riordan had to pry the door open. Deputy Moffatt said that inside the room was a "computer screen or TV monitor" "showing the house security cameras." He explained that a person in that room watching the monitor would have seen the patrol cars in the driveway.

Deputy Armando Mondragon testified that he and his partner, Deputy Moffatt, responded to the request for assistance with the welfare check on Steadmon. He testified that he ran Steadmon's name through the NCIC system, and it revealed that Steadmon's driver's license listed her residence as the Wilmot address and that she had an outstanding warrant from Pulaski County. Deputy

4

Mondragon testified that because Steadmon had soiled her clothes, he allowed her to go to the bedroom to retrieve new clothes; she then went into the adjoining bathroom and changed.

Steadmon moved for a directed verdict at the close of the State's case. She argued there was insufficient evidence that she had actual or constructive possession of a firearm. The circuit court denied the motion.

Steadmon's mother, Ann Standridge, testified for the defense. She stated that on May 11, 2023, she requested a wellness check on Steadmon when she failed to return home by dark. Standridge testified that Steadmon had been living with her in Lake Village since March to assist with home and yard maintenance. She acknowledged that Steadmon is a convicted felon but stated that she had never seen her with a firearm. On cross, Standridge testified that Steadmon and O'Neal are "off and on all the time" and that she moves in and out with him and "leaves clothes everywhere." She further admitted that, at the time of trial, Steadmon was living with O'Neal and that O'Neal's Wilmot address is the address she provided authorities for the wellness check.

Robert O'Neal was next to testify. He stated that on May 11, 2023, no one was living with him, but Steadmon was there "hanging out that day." O'Neal admitted that Steadmon had previously lived with him and is currently living with him, but on the day in question, she was living in Lake Village with her mother. He testified that the firearms found in the residence belonged to him and that Steadmon did not have access to the firearms and had never handled or touched them. O'Neal stated that he picked Steadmon up that day and that the two of the them hunted for arrowheads and marbles. When they went to O'Neal's house, an officer followed them into the driveway. While O'Neal spoke to the officer, Steadmon got out of the truck and went into the wood shop. He stated that Chief Riordan informed him that he was conducting a wellness check on Steadmon, and O'Neal

5

told him that she was not there. According to O'Neal, he went into the wood shop when Chief Riordan started to leave the property. Shortly thereafter, Chief Riordan returned with two other officers and searched the residence. On cross, O'Neal explained that the women's items in his home could have belonged to his teenaged daughter or a previous girlfriend. He also testified that although Steadmon did not live with him on May 11, 2023, she moved back into his home the following month and has lived there since. O'Neal stated that the firearms in the shop and kitchen "never crossed [his] mind" but that when he and Steadmon had previously been together, he made sure to get the guns out of the house. He acknowledged that anyone in the house could have grabbed the firearms if the person wanted to.

Steadmon renewed her directed-verdict motion at the close of all evidence, which was again denied. Steadmon was convicted of possession of a firearm by certain persons and sentenced to eight years in prison. She now appeals.

On appeal, Steadmon challenges the sufficiency of the evidence supporting her conviction. She argues that the circuit court erred in denying her motion for directed verdict because the evidence was insufficient to establish that she possessed any of the firearms discovered inside the residence. She contends that there was no evidence that she lived in the residence where the firearms were found, nor were there any additional factors linking her to the firearms found in the jointly occupied home.

We treat a motion for a directed verdict as a challenge to the sufficiency of the evidence.[3] When reviewing a challenge to the sufficiency of the evidence, we view the evidence in the light most

---

[3]*Kelley v. State*, 103 Ark. App. 110, 286 S.W.3d 746 (2008).

favorable to the State and consider only the evidence that supports the verdict.[4]  We will affirm a judgment of conviction if substantial evidence exists to support it.[5]  Substantial evidence is evidence of sufficient force and character that it will, with reasonable certainty, compel a conclusion one way or the other without resorting to speculation or conjecture.[6]  We defer to the jury's determination on the matter of witness credibility.[7]  Jurors do not and need not view each fact in isolation; rather, they may consider the evidence as a whole.[8]  The jury is entitled to draw any reasonable inference from circumstantial evidence to the same extent that it can be drawn from direct evidence.[9]  The jury may resolve questions of conflicting testimony and inconsistent evidence and may choose to believe the State's account of the facts rather than the defendant's.[10]  We need only consider testimony that supports the guilty verdict.[11]  Circumstantial evidence may provide the basis for a conviction if it is consistent with the defendant's guilt and inconsistent with any other reasonable explanation of the crime.[12]

---

[4]*Id.*

[5]*Id.*

[6]*Id.*

[7]*Id.*

[8]*Id.*

[9]*Id.*

[10]*Dunn v. State*, 371 Ark. 140, 264 S.W.3d 504 (2007).
[11]*Holcomb v. State*, 2014 Ark. 141, 432 S.W.3d 600.

[12]*Robinson v. State*, 2016 Ark. App. 240, 491 S.W.3d 481.

A person commits the offense of possession of a firearm by certain persons if the person has been convicted of a felony and possesses or owns a firearm.[13] Steadmon stipulated to her status as a convicted felon and challenges only the proof supporting the finding that she possessed a firearm.

Possession of a firearm by certain persons requires a showing that the defendant "possessed" the firearm. It is not necessary that the State prove actual possession of the firearm, and a defendant's constructive possession will suffice.[14] A showing of constructive possession, which is the control of, or right to control, the contraband, is sufficient to prove possession of a firearm.[15] Constructive possession may be inferred when the firearm is found in a place immediately and exclusively accessible to the accused and subject to his or her control.[16]

To prove constructive possession, the State must establish that the defendant exercised "care, control, and management over the contraband."[17] There must be some evidence that the accused had knowledge of the presence of the contraband.[18] The defendant's control over and knowledge of the contraband can be inferred from the circumstances, such as proximity of the contraband to the accused, the fact that it is in plain view, the ownership of the property where the contraband is found,

[13]Ark. Code Ann. § 5-73-103(a)(1).

[14]*Taylor v. State*, 2022 Ark. App. 464, 655 S.W.3d 330.

[15]*White v. State*, 2014 Ark. App. 587, 446 S.W.3d 193.

[16]*Johnson v. State*, 2014 Ark. App. 567, 444 S.W.3d 880.

[17]*Block v. State*, 2015 Ark. App. 83, at 6, 455 S.W.3d 336, 340 (quoting *Harrison v. State*, 371 Ark. 474, 482, 268 S.W.3d 324, 331 (2007)).

[18]*Id*.

and the accused's suspicious behavior.[19]   Location of the contraband in close proximity to the defendant has been held to be a sufficient linking factor to support a constructive-possession conviction.[20]

Here, during the course of a welfare check and subsequent search of the residence, Steadmon was discovered hiding alone in the locked wood shop.  On the wall gun rack, which was near her in that locked room, was a readily accessible firearm.  While she does not dispute that a gun was found in plain sight and in close proximity to her, she asserts that the State failed to demonstrate that she constructively possessed the firearm.  Specifically, she asserts that there are no additional linking factors to support a finding that she constructively possessed the firearm because she did not live in the house.

Steadmon contends that O'Neal, her on-and-off boyfriend, owned the residence.  She further asserts that the evidence establishes that although she had lived in the home prior to the incident, she did not live in the home on that day.  Steadmon fails to cite any authority that requires the State to show that she owned the house or that she lived in the house to prove constructive possession. Moreover, the evidence and testimony presented showed that Steadmon's driver's license and probation search waiver listed the address as her residence.  Her wallet containing her identification that listed the Wilmot address was located inside the wood shop with Steadmon.  Furthermore, women's clothing items were found inside the home, including the master bedroom; Steadmon changed into these clothes prior to being transported to jail.  The testimony also established that

[19]*Id.*

[20]*Id.*

Steadmon lived at the address before and after the May 11 search of the home. There was abundant evidence to support a finding that Steadmon resided at the house. Also, as already stated, location of the contraband in close proximity to the defendant has been held to be a sufficient linking factor to support a constructive-possession conviction.[21] Steadmon acknowledges that the firearm was in close proximity to her. Viewing the evidence in the light most favorable to the verdict, we hold that there is substantial evidence that Steadmon constructively possessed the firearm discovered in plain sight near her in the locked wood shop.

Affirmed.

WOOD and MURPHY, JJ., agree.

*Vicki Lucas*, for appellant.

*Tim Griffin*, Att'y Gen., by: *Kent G. Holt*, Ass't Att'y Gen., for appellee.

---

[21]*Id.*