

# ARKANSAS COURT OF APPEALS

DIVISION IV
No. CR–12–724

| | |
|---|---|
| OLIVIA MOODY<br>APPELLANT<br><br>V.<br><br>STATE OF ARKANSAS<br>APPELLEE | **Opinion Delivered** October 8, 2014<br><br>APPEAL FROM THE JEFFERSON COUNTY CIRCUIT COURT<br>[NO. CR-2011-377-1-5]<br><br>HONORABLE JODI RAINES DENNIS, JUDGE<br><br>AFFIRMED |

## BRANDON J. HARRISON, Judge

A Jefferson County jury convicted appellant Olivia Moody of second-degree murder in the death of Vanessa Bearden. Ark. Code Ann. § 5-10-103 (Repl. 2009). Moody was sentenced to thirty years' imprisonment as punishment. The issues Moody appeals are that the circuit court erred by (1) permitting the State to cross-examine her about a Facebook post, (2) admitting text messages from her phone, (3) limiting cross-examination of a State witness in violation of her Sixth Amendment rights, (4) abusing its discretion because it failed to submit her proffered instruction to the jury, and (5) denying her directed-verdict motion because the State failed to negate her justification defense.

We treat motions for directed verdict as challenges to the sufficiency of the evidence. *Tillman v. State*, 364 Ark. 143, 217 S.W.3d 773 (2005). We will first address Moody's argument about her justification defense and the court's denial of her directed-



verdict motion. *Boldin v. State*, 373 Ark. 295, 297, 283 S.W.3d 565, 567 (2008). Some of the trial testimony was confusing, but a fair summary of the testimony as a whole is presented below.

## I. *Justification Defense*

Colby Dukes testified during Moody's trial that the following events occurred on 26 June 2011. Dukes and the victim, Vanessa Bearden, went to the Holiday Apartments in Pine Bluff to visit a friend, Alisha Jeffers. As they pulled into the parking lot, Dukes reported that she and Bearden saw Jeffers "hollering" at a woman walking in the street. The woman, who was later identified as Olivia Moody, responded to Jeffers that "I'm not worried about it. So what's up?" The verbal confrontation eventually resulted in a physical fight between Moody and Jeffers, and a fairly large crowd of people closely gathered around to watch.

Dukes told the jury that at some point during the fight she too fought Moody for about ten seconds and that a man named Brian Gaddy pulled Moody off of her. Moody then broke free from Gaddy's grasp and ran straight to Vanessa Bearden, who was recording the fight on her cell phone. Moody and Bearden fought for a brief time, until Gaddy picked up Moody, put Moody in his vehicle, and drove away.

Alicia Jeffers left Dukes's and Bearden's company, and Dukes and Bearden walked to a fenced, shaded area in a nearby apartment complex across the street from where Jeffers lived. The two girls sat on the wooden fence while hanging out with a group of people. About forty-five minutes later, Dukes said that they noticed a white Tahoe driving by with Moody sitting in the passenger seat. The vehicle made several passes by

SLIP OPINION

the apartment buildings and when the Tahoe came in front of the group of girls sitting on the wooden fence, it slowed. Dukes said that Moody rolled down the passenger side door window and said "Y'all, come on; ya'll, come see me." The Tahoe then drove off.

Approximately ten minutes later, according to Dukes, a man named Garyl Allen appeared. Allen testified during the trial that Moody had told him, "Go around and tell them [the girls sitting on the fence] to come around here if they still want to fight and jump on me." Allen delivered the message, but the girls "didn't buy into it" and continued to sit on the fence. He then told Moody that "[the girls] didn't want to fight." At that time, according to Allen, Moody was about forty yards from a breezeway, where he was standing; she began to walk straight towards him.

Moody continued to walk past Allen, who was in the breezeway. When Moody came close, Allen said that he noticed that she had a gun in her right hand. Allen followed "two or three feet" behind Moody as she walked. When Moody and Allen reached the end of the breezeway, Allen said that he saw that a few of the girls had "disappeared" from sitting on the fence, but that Bearden was "running back and forwards, like [she] didn't know which way to go." According to Allen, when Bearden saw Moody, Bearden turned around to go the other way and Moody "pulled a gun and shot one time." Allen testified that Bearden and Moody were about six feet apart and that Bearden had nothing in her hands when she was shot. After Moody shot Bearden, she pointed the gun at another girl sitting on the fence; Allen said that he stopped Moody by saying that the girl on the fence had "nothing to do with it."



Returning to Colby Dukes's account of events, after Garyl Allen had conveyed the message to the girls on the fence, Vanessa Bearden stood up to go towards the breezeway, but did not get very far. Dukes warned Bearden not to see what Moody wanted because it seemed "fishy." Bearden then showed Dukes a little pocket knife that she kept tucked in her shorts and covered by her shirt. According to Dukes, Bearden walked about three feet toward the breezeway when Moody appeared with a small gun. Dukes heard Moody yell something provocative, but ran away when she saw Moody had a gun. Dukes turned around when she heard Bearden yell and saw that Bearden was holding herself and running at the same time. Dukes ran for a while before stopping and coming back to the crime scene. When she arrived, Bearden was on her back bleeding. James Barnes, a minister, who had seen some of the prior events, appeared and started CPR.

Reverend Barnes testified that he was across the street in the parking lot of his church when the shooting occurred. Barnes said that he saw one girl running away and that the girl who was running had made it about five steps before she was shot by another girl standing and holding a gun. The shooter turned around and walked back into the breezeway. Somebody told him that the girl was dying, so he ran to the girl and started CPR. Reverend Barnes testified that he removed a knife on the inside right area of the victim's clothes before the police and an ambulance arrived.

Dr. Daniel Dye from the Arkansas State Crime Lab testified that Bearden's death was caused by a wound from a 9mm bullet, which was consistent the with shell casing found on the scene. According to Dr. Dye, the bullet had entered Bearden's back on the



left side and exited in the front on the right side of her chest. Bearden also had wounds on her knees consistent with a fall.

Pine Bluff police detective Shawn Davis testified that Moody was an immediate suspect in Bearden's death. Police searched Moody's apartment but found no weapons. Moody was brought in for questioning the night the shooting occurred. Moody told Detective Davis that she was injured in a fight earlier that day. Davis took photographs of Moody's injuries, and the State entered them as evidence during the trial. Detective Davis concluded that the photos showed that Moody had no visible or significant injuries.

At the close of the State's evidence, Moody moved for a directed verdict because "The State has failed to rebut [her] justification defense and has failed to produce any proof . . . that [she] could have avoided the necessity of using deadly force with complete safety by retreat."

Moody testified in her own defense. She explained that Jeffers had dated her former boyfriend. On the afternoon of the shooting, Moody said that a group of eight or so girls, including Jeffers, wanted to fight her and that she did not know any of the girls save Jeffers. Moody said that she and Jeffers started fighting, and Moody ended up in a ditch on the opposite side of the street. Moody said she "presumed" that the crowd gathered around to fight her. In Moody's view, all she could do to protect herself was to cover her face and ball up in the ditch. Moody explained that she broke free from K.C.'s (aka Brian Gaddy) grasp to look for her phone, money, and keys. Moody testified that she tried to go home, but the girls who had fought her were in front of her apartment. At some point, Gaddy gave Moody a gun. Moody then returned to her apartment building's



rear entrance. Moody said that she was afraid because there was a group of girls that she did not know sitting on the fence, and they were waiting to fight her. As she walked through the breezeway with the gun, she was confronted by a group of girls with one saying, "Get her . . . ." Moody feared for her safety because she thought that the girls were going to jump her again. Moody said she fired the gun "to scare them."

On cross-examination, Moody admitted that Vanessa Bearden did not have a weapon in her hand and that no one had threatened Moody with one. Moody also admitted to having the keys to her apartment on her person, and not going to her apartment; instead, she headed towards the group of girls who had gathered along the fence. Moody said that she had thought the girls would fight her "regardless" and that she went towards the group of girls (holding the gun) to tell them that "fighting me because someone else is fighting me over a boy. That is dumb."

Moody renewed her motion for directed verdict after all the evidence was presented, arguing that she "feared that she would, in fact, be seriously injured and that she feared for her life when she was in the ditch at the first fight . . . And also when the girls came toward her, the five girls, that she was in fear that they would do serious bodily harm to her, if not, you know, cause her death."

Moody contends here that the circuit court erred when it denied her motion for directed verdict because the State failed to negate her justification defense. We disagree and affirm on this point.

A person commits murder in the second degree if she "[k]nowingly causes the death of another person under circumstances manifesting extreme indifference to the value

of human life" or "[w]ith the purpose of causing serious physical injury to another person . . . causes the death of any person." Ark. Code Ann. § 5-10-103(a)(1)–(2) (Repl. 2013). A justification defense is conditioned on a reasonable belief on the part of the actor that unlawful physical force is about to be inflicted on her. *See* Ark. Code Ann. § 5-2-607 (Repl. 2013); *McDonald v. State*, 42 Ark. App. 37, 42, 852 S.W.2d 833, 836 (1993). Under Arkansas law, the State must prove each element of an offense. Ark. Code Ann. § 5-1-111(a)(1) (Repl. 2013). When the defendant submits evidence supporting a defense, "any reasonable doubt on the issue requires that the defendant be acquitted." Ark. Code Ann. § 5-1-111(c). Whether circumstances negate a defendant's excuse or justification is an element of the offense. *See* Ark. Code Ann. § 5-1-102(5)(C); *Anderson v. State*, 353 Ark. 384, 108 S.W.3d 592 (2003).

In reviewing Moody's challenge to the sufficiency of the State's evidence, we ask whether the verdict is supported by substantial evidence; the evidence can be direct, circumstantial, or some combination of the two. *Dunn v. State*, 371 Ark. 140, 264 S.W.3d 504 (2007). For circumstantial evidence to be substantial, it must exclude every reasonable hypothesis other than the accused's guilt. The jury gets to decide whether the circumstantial evidence excludes every hypothesis consistent with innocence. Substantial evidence forces or compels a conclusion one way or the other so that the jury does not have to speculate to reach a decision. We will not overturn its determination unless the verdict required speculation and conjecture. The jury also weighs the evidence and judges witness credibility. *Id.*



Moody argues that she was not the first aggressor, that her apprehension of suffering great bodily harm was reasonable because she had been assaulted by the group of girls approximately one hour before the shooting, and she shot the gun only in an honest attempt to scare the girls. Moody primarily relies on her own testimony.

We hold that substantial evidence exists to support Moody's conviction for second-degree murder. The jury was not required to believe Moody's testimony. *Thomas v. State*, 266 Ark. 162, 583 S.W.2d 32 (1979). Justification is a question of fact that the jury can resolve, and it is largely based on what the jury concluded regarding Moody's intent. *See Smith v. State*, 30 Ark. App. 111, 115, 783 S.W.2d 72, 74 (1990). The jury could have reasonably rejected Moody's justification defense based on the evidence presented at trial. The jury could have, among other things, credited Garyl Allen's testimony that Moody began to walk straight towards Bearden holding a gun after he told Moody the girls did not want to fight. As for the reasonableness of the Moody's belief that she was in danger of being killed or suffering great bodily injury, the issue was for the jury to decide based on the evidence presented. *See Humphrey v. State*, 332 Ark. 398, 408–09, 966 S.W.2d 213, 218 (1998).

The court did not err by denying Moody's directed-verdict motions based on the record presented.

## II. *Jury Instruction*

A closely related issue comes next: did the court abuse its discretion by refusing to give the jury Moody's proffered jury instruction on justification? *See Clark v. State*, 374



Ark. 292, 305, 287 S.W.3d 567, 576 (2008) (reviewing alleged jury-instruction error under an abuse-of-discretion standard). We hold that it did not.

The instruction at issue is AMI Crim. 2d 704, which is based on Arkansas Code Annotated section 5-2-607 (Supp. 2011). The statute states that:

(a) A person is justified in using deadly physical force upon another person if the person reasonably believes that the other person is:
  (1) Committing or about to commit a felony involving force or violence;
  (2) Using or about to use unlawful deadly physical force; or
  (3) Imminently endangering the person's life or imminently about to victimize the person as described in § 9-15-103 from the continuation of a pattern of domestic abuse.

(b) A person may not use deadly physical force in self-defense if the person knows that he or she can avoid the necessity of using deadly physical force with complete safety:

(1)(A) By retreating.
  (B) However, a person is not required to retreat if the person is:
    (i) In the person's dwelling or on the curtilage surrounding the person's dwelling and was not the original aggressor;

. . . .

(c) As used in this section:

(1) "Curtilage" means the land adjoining a dwelling that is convenient for residential purposes and habitually used for residential purposes, but not necessarily enclosed, and includes an outbuilding that is directly and intimately connected with the dwelling and in close proximity to the dwelling[.]

The Notes on Use to AMI Crim. 2d 704 state that the court may decide that one or more options for the jury instruction's wording, including the curtilage instruction, may be "inserted depending upon the evidence in the case." When the evidence does not support the giving of an instruction, it is not error to refuse it. *Christian v. State*, 318 Ark. 813, 889 S.W.2d 717 (1994).

9



Here, the circuit court gave the standard AMI jury instruction (based on section 5-2-607), except that it intentionally omitted the "curtilage" concept because the court thought it had no legal basis to allow the jury to consider it. Moody says that the court's justification instruction was incomplete without the curtilage language and should not have been submitted to the jury in the form it was. The State, however, presented evidence during the trial that Moody did not enter her apartment and that the breezeway Moody walked through on her way to the fence where the girls were sitting was a common area of a separate apartment unit. Moody argued she was within her apartment's curtilage because she was close to the apartment.

The circuit court did not abuse its discretion by refusing to include a curtilage instruction. Having looked to some Fourth Amendment caselaw to help inform us on the curtilage question, we do not believe that the grassy area where Moody confronted Bearden and shot her could properly be considered curtilage. *See Walley v. State*, 353 Ark. 586, 605, 112 S.W.3d 349, 360 (2003) (A person does not have a reasonable expectation of privacy in common driveways and walkways.); *see also Gustafson v. State*, 267 Ark. 830, 833, 593 S.W.2d 187, 189 (1979) (A defendant had no reasonable expectation of privacy in the wooded area behind his apartment and this area was not within the purview of one's "curtilage" as defined by our caselaw.). It is important to point out that Moody was not prohibited from presenting her justification defense to the jury. The court instead tailored the instruction to fit the facts of the case in light of its understanding of the curtilage concept. It did not abuse its discretion by refusing an optional portion of the model instructions when there was no strong legal reason to characterize the particular



geographical space where Moody shot Bearden as being within the curtilage of Moody's dwelling.

### III. *Cross-Examination of Garyl Allen*

The third issue on appeal is whether the court abused its discretion in limiting Moody's cross-examination of Garyl "G-Rel" Allen. Moody argues that the court placed unreasonable restrictions on her cross-examination because it did not allow her to ask about (1) Allen's bias due to his probationary status and desire for leniency from the State; (2) Allen's prior sworn statement about other altercations leading to the shooting of Vanessa Bearden; and (3) Allen's prior sworn statement about Moody's act of self-defense. Moody argues here that the court's restrictions violated her Sixth Amendment rights under the United States and Arkansas Constitutions.

Our supreme court has held that a defendant's right to confront witnesses against him or her is guaranteed by the Sixth Amendment to the United States Constitution and article 2, section 10, of the Arkansas Constitution. *See Bowden v. State*, 301 Ark. 303, 308–09, 783 S.W.2d 842, 844–45 (1990). This constitutional right includes the opportunity to conduct effective cross-examination. *Id*. But to preserve a confrontation clause argument on appeal, a defendant must obtain a ruling from the circuit court on that specific issue. *Bertrand v. State*, 363 Ark. 422, 429, 214 S.W.3d 822, 826–27 (2005).

Although Moody objected to the court's limitation on her cross-examination of Allen during her trial, she did not argue to the circuit court that the lack of cross-examination violated her constitutional rights, nor did she obtain a ruling from the court on any constitutional issue regarding Allen's testimony. Moody's appellate argument that



the circuit court erred under our federal and state constitutions by placing unreasonable restrictions on her cross-examination of Garyl Allen is not preserved for review.

IV. *Text Message*

Moody also argues that the court erred by permitting the State to cross-examine her about a text message sent to her phone around 9:46 p.m. the night of the shooting. Moody testified that her cell phone was taken during the first fight with Alisha Jeffers. Immediately after Moody's cross-examination statement, the court held a bench conference outside the hearing of the jury.

The State wanted to introduce a picture of a phone message that was sent to Moody's phone after the shooting occurred. The message was from Moody's cousin, who lived in Chicago. Moody argued that the text message was hearsay, that she did not possess the phone when the message was sent, and that the message was sent "way after the fact." Moody said it was "highly prejudicial" because it was a message sent by someone else to Moody when she did not have the phone, which was likely already in police custody, and that the jury would get the impression that she was trying to "hide something." The State argued that it had a right to ask Moody if she talked to her cousin Bianca after the shooting, or if she had seen the message, or knew anything about it. According to the State, "this appear[ed] to be a message delivered by the shooter or on behalf of the shooter. It will either be authenticated by her or it will not, but [the State] has a right to inquire." The court ruled that the text message "is never going to get introduced" but that the State could ask Moody about how her cousin knew that



somebody had been shot. The court also said it would allow the State to ask Moody about whom she talked to and if she told anyone that she had killed someone.

The trial resumed and the State started to question Moody about her cell phone. Moody said that her cell phone was taken by one or more of the girls that she had originally fought with. She also admitted that her cousin Bianca was a contact in her phone. Moody flatly denied that she had knowledge of any text messages sent to her phone by Bianca. The prosecutor then asked Moody if she recognized the phone he was holding. Moody answered yes, and defense counsel promptly objected. The State then withdrew its question and passed Moody as a witness.

Moody essentially argues that the court abused its discretion by allowing the State to display the cell phone and otherwise "imply that the text message communicated threats and indicated the state of appellant's mind on the night of the shooting" because she was required to identify the phone and acknowledge the text from her cousin in front of the jury.

The text message was never admitted as evidence, and its content was never revealed to the jury. Second, the court sustained Moody's hearsay objection to the message, and when she objected the second time to the State asking about her phone, the State withdrew its question. So Moody received all the relief she had requested from the court. There was no abuse of discretion in any event. *See Gilliland v. State*, 2010 Ark. 135, 361 S.W.3d 279.

SLIP OPINION

V.  *Facebook Posts*

Moody alleges that another evidentiary error occurred when the court allowed the State to cross-examine her about past Facebook posts.

Moody filed a motion in limine seeking to exclude certain "email communications."  She argued that the emails were not material (or probative) to her criminal charges and that some of the emails were prejudicial because they contained "language generally considered vulgar and offensive."  In Moody's view, the State sought to introduce such evidence to "cast aspersions on [her] character and to unduly prejudice [her] in the eyes of the jury."  The court did not rule on the motion in limine.

The following colloquy occurred between Moody and her lawyer on direct examination:

| | |
|---|---|
| DEFENSE COUNSEL: | [H]as Alisha [Jeffers] ever said anything to you about her—the young man you used to date? |
| MOODY: | Yes. |
| DEFENSE COUNSEL: | Without telling me what she said, how would you describe her attitude about that in the late spring as we move toward June? |
| MOODY: | She was more—I guess she was trying to brag, more like, That's my boyfriend now; it's not yours.  Like it was more trying to, I guess, make me feel bad now that she was dating my boyfriend—well, my ex-boyfriend. |
| DEFENSE COUNSEL: | Okay.  Did you respond to that? |
| MOODY: | No. |
| DEFENSE COUNSEL: | When she would bring that up, you would not respond—is your testimony? |
| MOODY: | That's my testimony. |

SLIP OPINION

On cross-examination, Moody was asked the following questions:

PROSECUTOR:               Now, you indicated that Alisha Jeffers and you—there was some conflict over a boy.

MOODY:                    There was.

PROSECUTOR:               And you never responded to any of that conflict?

MOODY:                    I can't say never.  At the time we were fighting, I never responded to anything that she did.

PROSECUTOR:               You are talking about the day of the fight?

MOODY:                    Right.

PROSECUTOR:               Prior to that you had responded to it, hadn't you?

MOODY:                    Yes.

PROSECUTOR:               And there were several Facebook posts—

DEFENSE COUNSEL:     Objection.

The court held a bench conference outside the jury's hearing on the Facebook posts.  Moody's counsel argued that the Facebook posts were irrelevant because they were not threatening; the statements were made over ten weeks before the shooting happened; and he never asked Moody about any social media on direct examination.  The State responded that Moody had testified on direct examination that she did not respond to Jeffers, and it had a right to cross-examine her on the truth of her statement.  The court ruled that the Facebook posts could not be entered as evidence in the record but that the State could ask Moody about any responses she had to Jeffers.

After the trial reconvened, Moody admitted on cross-examination that she had traded Facebook posts back and forth with Jeffers.  She said the Facebook messages were

15



about "leave me alone; you be with him." Moody also said that she was unsure if she said anything else to Jeffers but agreed that, at times, it was not a pleasant conversation.

Moody argues here that "the State was allowed to both confuse and mislead the jury by implication of threats purported to exist in Facebook posts which did not exist." She says that the evidence should have been excluded under Arkansas Rules of Evidence 401 and 403 because the Facebook posts were not relevant and were more prejudicial than probative.

We review matters concerning the scope of cross-examination under an abuse-of-discretion standard. *Rodgers v. State*, 360 Ark. 24, 27, 199 S.W.3d 625, 627 (2004). Our supreme court has said that the use of cross-examination is an important tool in bringing the facts before the jury and that wide latitude should be afforded by the circuit court. *Id*. That said, a circuit court must determine when the matter has been sufficiently developed and when the outer limits of cross-examination have been reached. But unless the court's discretion was exercised thoughtlessly, we will not reverse. *Id*.

The content of the Facebook messages, whatever it was, was never exposed; no prejudice could therefore have resulted. And the State never alleged, in front of the jury, that threats were made on Facebook—it asserted that the exchanges between Moody and Jeffers were unpleasant. The two concepts (threats versus unpleasant exchanges) as they came up in this case do not establish reversible error. Regarding the scope of the cross-examination being too far, Moody said on direct examination that she had not responded to Jeffers, so the State's questioning of Moody on cross-examination about her past responses via Facebook responded to her testimony on direct examination, was probative



of her truthfulness, and not unduly prejudicial. The court did not abuse its discretion in allowing the cross-examination to proceed as it did.

## VI. *Conclusion*

We affirm Moody's conviction in all respects and the related sentence.

Affirmed.

WYNNE and GLOVER, JJ., agree.

*McKissic & Associates, PLLC*, by: *Gene E. McKissic, Sr.*, for appellant.

*Dustin McDaniel*, Att'y Gen., by: *Kent G. Holt*, Ass't Att'y Gen., for appellee.