Cite as 2025 Ark. App. 404

# ARKANSAS COURT OF APPEALS

DIVISION I
No. CR-24-371

|  |  |  |
|---|---|---|
| DONALD LEE CAMP | | **Opinion Delivered** September 3, 2025 |
| | APPELLANT | APPEAL FROM THE PERRY COUNTY CIRCUIT COURT |
| V. | | [NO. 53CR-22-11] |
| STATE OF ARKANSAS | | HONORABLE CATHLEEN V. COMPTON, |
| | APPELLEE | JUDGE |
| | | AFFIRMED |

### STEPHANIE POTTER BARRETT, Judge

Donald Camp was convicted by a Perry County Circuit Court jury of second-degree murder in the death of Bryan Burnett and sentenced as a habitual offender to forty years' imprisonment. On appeal, Donald argues the circuit court erred in denying his motion for directed verdict because the evidence was insufficient to support the second-degree-murder conviction and to negate his justification defense; he also argues that the circuit court abused its discretion in refusing to allow him to impeach the victim's wife on prior inconsistent statements. We affirm.

At trial, Daniel Hamilton, a Harris Brake volunteer firefighter, testified that on November 2, 2021, he was called to Cliff Smith's home in Houston, Arkansas, on a report that someone had been hit by a truck. When he arrived, he found Bryan's body lying with

his head inside his truck and his legs hanging out of the truck; his head had been covered with a jacket. He checked Bryan's vital signs but found no pulse.

Hope Deaver, Bryan's wife, testified that she was present when Donald hit Bryan with his truck. As background information, she explained that Bryan and Donald's brother Adam had been arguing for several years about Adam's bullying Bryan's niece, and as a result of the ongoing feud, Bryan had taken Adam's motorcycle. Hope said she had seen Donald and Adam one time after that, on July 4, 2021, at Bryan's father's house in Plumerville—Donald, Adam, and Clint Leach were there, but Bryan was not. After Hope left, Bryan called her, breathing heavily; he knew the Camps and Leach were at his father's house, and he told her to meet him at the American Legion. While Hope was picking Bryan up, the Camps drove by; Donald pulled into the parking lot, and Bryan pulled a gun and pointed it at the Camps, but he did not shoot the gun.

On November 2, Bryan, Hope, and their two-year-old son were at Cliff Smith's house; they were standing in front of Cliff's house while he was splitting wood when Donald turned his one-ton truck with a metal brush guard on the front into Cliff's long straight driveway, pulling a gooseneck car hauler loaded with another truck. When Donald pulled into the driveway, Cliff said, "Oh sh*t, Bryan. That's Donnie Camp." Bryan was calm and said that everything was "all right." Hope said that when Donald pulled into the driveway, he "just floored" the truck, "pedal to the metal," and she told Bryan there was a gun in their truck on top of her purse. As Hope ran toward her son, she saw Donald drive toward Bryan, and Bryan had both hands in the air yelling at Donald that "it ain't got to be like this." Hope

testified that Donald had a blank look on his face as he drove toward Bryan; she said she saw Donald's truck hit Bryan and that Bryan was "stuck" to the front grill of the truck from the impact until Donald jerked the wheel, flinging Bryan onto the ground where he lay face down and motionless. She said that after Donald hit Bryan, he drove into the field, turned around, pulled his truck next to Bryan's body, and got out. Hope said she saw Donald kick Bryan's head, although she did not actually see Donald strike Bryan because dust was flying everywhere; however, she heard Donald yell, "You ain't never gonna pull on me again, motherf**ker." When Hope asked Donald why he hit Bryan so hard in front of his son, Donald told her, "He's done admitted to it. He's gonna tell me where my brother's bike is." Hope pleaded with Donald to turn Bryan over to see if he was breathing; when he finally turned Bryan over, Donald began doing what Hope called "backwards CPR" and said, "Breathe, motherf**ker, breathe." Donald dragged Bryan's body around the back of Bryan's truck and shoved him into the passenger seat, telling Hope to get him to the hospital. Hope got in the driver's seat of the truck, but she was unable to drive the truck because she had undergone an emergency C-section on October 23. As Donald got into his truck to leave, he told Hope that she had better tell the hospital that it was a logging accident. Hope testified that she never saw Bryan with a gun; she did not see the gun until a police officer retrieved it from the back of their truck.

On cross-examination, Hope testified that they had not planned on being at Cliff's house that day, and they did not know Donald would be there. Hope said that when Cliff told them it was Donald coming down the driveway in the truck, Bryan said it was okay

3

because he did not have a beef with Donald. However, when Donald began to accelerate, Hope told Bryan about the gun on top of her purse. When Hope was asked why she wanted Bryan to have a gun, she said that she really did not want him to, but because Donald floored the accelerator aggressively, and the two of them had a history, she was concerned about their safety. When defense counsel stated that Bryan was dead because he was going to shoot Donald, Hope said that Bryan had never pointed a gun at Donald that day. Hope admitted that she never told the police about the gun; she said she never saw Bryan point a gun at Donald, so she did not think it was relevant. Hope said she assumed Donald was kicking Bryan's head because dust was flying.

On redirect, Hope said that she did not know Donald's exact speed but that he was going as fast as he could go pulling the other truck behind him. Hope clarified that she did not see Bryan with a gun or see Donald kick a gun after he hit Bryan; she did not see a gun until the police officer retrieved it from the back of their truck.

Cliff Smith testified that he had known Donald for over forty years, and he knew Bryan through mutual friends. He said that Bryan, Hope, and their son had shown up at his house while he was cutting firewood; while they were visiting, Cliff recognized Donald's truck as it turned into his driveway, and he told Bryan that they might want to "go ahead and leave." He said Bryan reached into his truck, grabbed a gun, "stuck it in his britches," and began walking toward the driveway. As Cliff walked toward his house, he could hear the truck "rev up," and when he turned around, he saw Bryan cartwheeling through the air and then hit the back of his truck. Cliff never saw Donald kick Bryan.

4

Cliff testified that a couple of weeks before the incident, Donald had told him that he and Bryan were not getting along and that he "was probably going to f**k him up when he saw him." Cliff did not see the gun again after Bryan put it in his pants until the officer retrieved a gun from the bed of Bryan's truck. After Donald hit Bryan, Cliff told him, "I think you f**ked him up, Donnie," to which Donald responded, "Well, that's what he gets for stealing my motorcycle." Cliff said Donald went over to Bryan, shoved him, and told him to get up. When Bryan did not move, Donald and Cliff put him in the front seat of his truck and called 911. Cliff said that Donald told him to get the gun from Bryan, but there was not a gun near Bryan. Donald told Hope to take Bryan to the hospital and tell them that he had a logging accident, and then Donald got into his truck and left.

Seth Race, an investigator with the Arkansas State Police, testified that he became involved when the Perry County Sheriff's Office requested assistance at the crime scene. When he arrived, he was informed that a first responder had located a pistol in Bryan's vehicle and that a deputy had taken possession of it prior to his arrival. Investigator Race instructed the deputy to document what had happened, who he had received the pistol from, and where it was located, and he documented the pistol in his summary, noting that it was a 9mm Smith and Wesson M&P containing twelve rounds in a fifteen-round magazine with one round in the chamber. He said that Cliff told him Bryan had taken a gun out of his vehicle and put it in his waistband as Donald drove down the driveway but that Hope had not told him about a gun.

Dr. Charles Kokes, an associate medical examiner at the Arkansas State Crime Laboratory, performed Bryan's autopsy. He testified that Bryan had scattered superficial blunt-force injuries on various parts of his body as well as more severe head and neck injuries, which were what caused his death. Bryan suffered a fractured lower jawbone on the front left side of his face, and some of his teeth were partially or completely broken away from the jawbone. Additionally, and most traumatic, Bryan's atlanto-occipital joint—the junction of the cervical spine and the base of the skull—was separated, causing damage to the spinal cord and tearing of major blood vessels, which resulted in diffused subarachnoid hemorrhaging of the brain. Dr. Kokes explained that the amount of damage resulting from that type of injury would cause immediate loss of consciousness as well as cessation of breathing within a short period of time. He opined that death occurred within a few minutes due to Bryan's inability to breathe properly, which would have led to cardiac arrest. Bryan also suffered a nondisplaced fracture of his left eighth rib, which was consistent with being struck by a vehicle on the left side of his chest. Dr. Kokes concluded that Bryan's injuries were consistent with being struck by a vehicle traveling in the range of twenty-five to thirty miles an hour.

The State rested after Dr. Kokes's testimony. Donald moved for a directed verdict, arguing that the State had failed to prove he purposely engaged in conduct that caused serious physical injury to Bryan. The circuit court denied the motion.

The defense called Jacob Lee, a first responder for the Harris Brake Fire Department, who testified that when he arrived on scene, he saw Bryan lying in the truck. He also noticed a firearm in the bed of the truck and notified a deputy of what he had found.

Donald testified in his own defense. His attorney questioned him about his criminal history, including the fact that he had been in prison for eighteen of the last twenty years; Donald said that he had been in so much trouble over the years that he had lost track of how many felonies he had. Donald denied murdering Bryan or that he had a grudge against him, but he admitted that his brother Adam, who was currently in prison for stealing from Bryan, had an issue with Bryan because he thought Bryan had stolen his motorcycle.

Donald testified that he had talked to Bryan's father and told him that Bryan and Adam needed to settle their differences before someone got hurt or went to jail; they were supposed to meet at Bryan's father's house on the Fourth of July weekend, but Bryan never showed up, so he and Adam left. He said they saw Hope in the American Legion parking lot, so they pulled in, and they saw Bryan emerge from the ditch with a gun; Donald tried to tell Bryan that they just wanted to talk, but Bryan told him that he was going come back without Hope and "settle this." Donald said he had told Cliff about the issue between Adam and Bryan, but he did not recall telling Cliff that he was going to f**k Bryan up.

Donald said that when he turned into Cliff's driveway hauling the other truck, he saw three people standing beside a small Chevy S-10 truck. He saw a man with a bandana, whom he recognized as Bryan, walking toward the driveway with his hand up. He testified that Bryan pulled a gun and pointed it at him and that he ducked down in the seat, gassed

7

the truck, and kept driving down the driveway. As he drove past Bryan's truck, he looked in the rearview mirror and saw Bryan hit the back of his own truck and then fall to the ground. Donald said he turned around, pulled up, and asked Cliff what was wrong with Bryan. When Cliff said, "I think he's f**ked up," Donald responded, "Well, hell, I guess that's what he gets for running out in the road." He testified that when he got out of the truck, he said, "'Where is that f**king gun' he had, you know? Because he had a gun in his hand"; he thought Hope or Cliff had moved the gun because he did not see it. Donald knew Bryan was badly hurt, so he had Cliff help him get Bryan into the truck. When asked why he left the scene, Donald explained that he was on parole, he had not been out for long, and he "hadn't had real good luck explaining my story to the cops." He said that he might have stayed had he seen the gun, but he just told Cliff to take Bryan to the hospital and then left. Donald admitted he told Hope to lie about what had happened to Bryan.

Donald testified that when Bryan ran out in the in the driveway and pointed a gun at him, it scared him. He was afraid Bryan was going to shoot him, so he ducked down, gassed the truck, and kept driving straight down the driveway, but he denied that he aimed for Bryan; he said that Bryan had plenty of time to get out of the way, but he did not do that. Although Donald admitted he gunned the truck, he said he was in low gear and not driving fast, and he could not have gained much speed pulling the trailer with the truck on it.

The defense rested after Donald's testimony. He renewed his motion for directed verdict, which was again denied.

Donald's first argument on appeal is that the circuit court erred in denying his motion for directed verdict because the evidence was insufficient to prove that he acted with the purpose to cause injury and did not act in self-defense. We affirm on this point.

A motion for directed verdict is treated as a challenge to the sufficiency of the evidence. *Gregory v. State*, 2025 Ark. App. 164, 708 S.W.3d 844. When reviewing a challenge to the sufficiency of the evidence, the evidence is assessed in the light most favorable to the State; this court considers only the evidence that supports the verdict and will affirm if there is substantial evidence to support it. *Id.* Substantial evidence is evidence of sufficient force and character that it will, with reasonable certainty, compel a conclusion one way or the other without resorting to speculation or conjecture. *Id.* Substantial evidence may be direct, circumstantial, or a combination of the two. *Moody v. State*, 2014 Ark. App. 538, 444 S.W.3d 389. Whether circumstantial evidence excludes every hypothesis consistent with innocence is for the jury to decide, not the appellate court. *Woods v. State*, 2025 Ark. 9, 704 S.W.3d 301.

Matters of credibility are for the jury, which can choose to believe part or all of any witness's testimony and resolve any conflict in the evidence or testimony. *Miller v. State*, 2025 Ark. App. 229, 711 S.W.3d 850. In resolving conflicting testimony and inconsistent evidence, the jury is entitled to believe the State's account of the facts rather than the defendant's version; jurors are not required to set aside their common knowledge when deciding a case—they may consider all the evidence in light of their own observations and experiences in the affairs of life. *Woods*, *supra*.

A person commits murder in the second degree if, with the purpose of causing serious physical injury to another person, the person causes the death of any person. Ark. Code Ann. § 5-10-103(a)(2) (Repl. 2013). Serious physical injury means, in part, physical injury that creates a substantial risk of death. Ark. Code Ann. § 5-1-102(21) (Supp. 2021). A person acts purposely with respect to his conduct or a result thereof when it is his conscious object to engage in conduct of that nature or to cause such a result. Ark. Code Ann. § 5-2-202(1) (Repl. 2013). A criminal defendant's state of mind is seldom capable of proof by direct evidence and must usually be inferred from the circumstances; a person is presumed to intend the natural and probable consequences of his or her actions. *Bealer v. State*, 2025 Ark. App. 337, 715 S.W.3d 483. The existence of criminal intent is for the jury to determine when criminal intent may reasonably be inferred from the evidence. *Id.*

Viewed in the light most favorable to the verdict, and notwithstanding Donald's claim of justification, *see Williams v. State*, 321 Ark. 635, 906 S.W.2d 677 (1995), substantial evidence supports his second-degree-murder conviction. The evidence showed that Donald saw Bryan and accelerated his truck as he drove down Cliff's driveway; he hit Bryan at an estimated speed of twenty-five to thirty miles an hour. According to Hope, Donald's face was expressionless as he drove toward Bryan; after he hit Bryan, Donald got out and yelled, "You ain't never gonna pull on me again, motherf**ker." Donald also told Hope that Bryan was going to tell him where Adam's bike was located. Furthermore, Cliff testified that not long before the incident, Donald told him that he and Bryan were not getting along and that he "was probably going to f**k him up when he saw him"; when Cliff told Donald after he

10

hit Bryan, "I think you f**ked him up, Donnie," Donald's response was, "Well, that's what he gets for stealing my motorcycle." There was substantial evidence to support the finding that Donald hit Bryan with his truck with the purpose of causing serious physical injury that caused Bryan's death.

Donald also argues that it was equally reasonable to conclude that he acted in self-defense, not with the purpose to cause injury. In *Williams*, *supra*, the appellant appealed his first-degree-murder conviction, arguing that there was insufficient evidence that he intended to cause the victim's death and that the evidence established justification for his act. Our supreme court held that there was substantial evidence that the appellant caused the victim's death with the purpose of doing so. With respect to the appellant's contention that he was justified in his actions, our supreme court held,

> [W]e observe the jury was instructed on self-defense, but chose not to accept that defense. Consistent with the fact that, on review of the denial of a motion for directed verdict, this court need only consider that evidence that supports the guilty verdict, and irrespective of appellant's evidence of justification, this court concludes the proof of appellant's guilt is substantial.

321 Ark. at 640, 906 S.W.2d at 681. Likewise, in the present case, the jury was also instructed on self-defense but, as in *Williams*, chose not to accept that defense. Having determined that there was substantial evidence to support the verdict, we hold that the circuit court did not err in denying the motion for directed verdict.

Donald's second point on appeal concerns the circuit court's refusal to allow him to impeach Hope with what he considered to be a prior inconsistent statement she made regarding Bryan's stealing Adam's motorcycle. We will not reverse a circuit court's decision

11

regarding the admission of evidence absent a manifest abuse of discretion. *Vasquez v. State*, 2025 Ark. App. 65, 704 S.W.3d 886. An abuse of discretion is a high threshold that does not simply require error in the circuit court's decision but requires that the court acted improvidently, thoughtlessly, or without due consideration. *Id.* An appellate court will not reverse a circuit court's evidentiary ruling absent a showing of prejudice. *Id.*

At trial, Hope admitted Bryan had stolen Adam's motorcycle. Donald wanted to impeach Hope with a statement from one of her police interviews. In it, Hope said Donald told her Bryan had stolen Adam's motorcycle, and Bryan was going to tell him where it was located, to which Hope responded,

> We don't know where it's at. We told you a thousand times. We don't know where it's at. We didn't take his bicycle. I mean, everybody else has took stuff back to him, so he knows we didn't steal all the other stuff. I don't know why he keeps saying we stole the bike. Or, Bryan—nobody said I stole the bike. Bryan stole the bike.

Donald argued that when viewed in context, Hope was denying that Bryan had stolen the motorcycle, which was inconsistent with her trial testimony. The State argued that the statement was not inconsistent because Hope only clarified that she did not steal the motorcycle, but she still admitted that Bryan had stolen it. The circuit court agreed with the State that it was not an inconsistent statement and ruled that Donald could not question Hope about it.

Rule 613(b) of the Arkansas Rules of Evidence provides that extrinsic evidence of a prior inconsistent statement is admissible only if the witness is given an opportunity to explain or deny it and the opposite party is afforded the same opportunity and is allowed to

12

interrogate the witness about the inconsistent statement. However, for Rule 613(b) to be applicable, there must first be an inconsistent statement. Without an inconsistent statement at trial, extrinsic evidence of a prior inconsistent statement by a witness is not admissible under Rule 613(b). *Vasquez, supra*. We hold that the circuit court's determination that Hope's prior statement was not inconsistent with her trial testimony was not an abuse of discretion. If there was no inconsistent statement, Donald cannot show that he suffered prejudice from the circuit court's ruling.

Affirmed.

ABRAMSON and WOOD, JJ., agree.

*Law Offices of John Wesley Hall*, by: *Samantha J. Carpenter*, for appellant.

*Tim Griffin*, Att'y Gen., by: *Jason Michael Johnson*, Ass't Att'y Gen., for appellee.