Cite as 2025 Ark. App. 460

# ARKANSAS COURT OF APPEALS
## DIVISION II
### No. CR-24-767

| | |
|---|---|
| KYLE WAYNE FAIRLESS<br><br>APPELLANT<br><br>V.<br><br>STATE OF ARKANSAS<br>APPELLEE | Opinion Delivered October 1, 2025<br><br>APPEAL FROM THE POLK COUNTY CIRCUIT COURT<br>[NO. 57CR-22-172]<br><br>HONORABLE MARCIA R. HEARNSBERGER, JUDGE<br><br>AFFIRMED |

**CINDY GRACE THYER, Judge**

A Polk County jury convicted appellant Kyle Fairless of raping his stepdaughter, MV,[1] and sentenced him to ten years' incarceration in the Arkansas Division of Correction. He now appeals that conviction, alleging that the circuit court erred in restricting his ability to impeach MV's testimony with evidence of an attempted settlement and in allowing MV's mother to testify regarding her emotional reaction to MV's disclosure. We affirm.

---

[1]The victim in this case was a minor when the alleged sexual abuse occurred but had reached the age of majority by the time charges were filed. However, in the spirit of protecting the minor victim's anonymity as set forth in Rule 6-3(b) of the Arkansas Rules of the Arkansas Supreme Court and Court of Appeals, we will identify the victim as MV in this opinion.

I. *Factual and Procedural History*

When MV was approximately seventeen years old, she disclosed to a friend that her stepfather, Kyle Fairless, had been sexually abusing her. The secret remained between MV and her friend until September 2017 when MV again disclosed the abuse to some friends and ultimately to her mother.

MV claimed that shortly after her mother and Fairless were married, he began sexually abusing her. According to MV, the abuse began when she was approximately eight or nine years old. She claimed that over the years, Fairless digitally penetrated her; he penetrated her both orally and vaginally; he would molest her while she was showering; and he ultimately had vaginal intercourse with her.[2]

After MV disclosed the abuse to her mother, her mother immediately reported the abuse to law enforcement. Because some of the alleged abuse occurred in Oklahoma, law enforcement in both Oklahoma and Arkansas investigated the allegations.[3] Oklahoma authorities declined prosecution.

After initially declining to file charges, in November 2022, the State of Arkansas filed a criminal information against Fairless alleging one count of rape. However, at some point during the five-year interim between the disclosure and the filing of charges, Fairless was

---

[2]Because sufficiency of the evidence is not at issue, the precise details of the alleged abuse are not repeated here.

[3]We note there is some indication in the record that Texas authorities also conducted an investigation, but the extent of that investigation is unclear.

placed on the Child Maltreatment Registry, and he appealed that placement. Then, on July 24, 2019, while that administrative appeal was ongoing and before criminal charges were brought, MV allegedly texted either the Arkansas State Police investigator or the DHS attorney handling the child-maltreatment action and proposed a settlement.[4] The text message stated the following:

> Hello, this is [MV] I have a case open against Kyle Fairless for rape and molestation over a period of 10 years. I was wondering if there would be a way for me to be able to reach a settlement and drop the case- and if need be sit down alissa, you, me, Kyle and his lawyer's, and come to some agreement. I would like to propose a payout of at least 15,000 for the damages to my mental health and trauma he has caused me- but I am aiming higher in case they want to negotiate lower. I have been kicked out of my friends house once again, and my fiancé and I had just gotten jobs and was getting our life back to being stable again. I have had to go to a psychiatric hospital and numerous other things have happened to due [sic] the trauma he has caused me. I even attempted taking my life twice here recently which had caused me to be admitted to Brentwood. The only reason I'm finally throwing my hands up and saying fuck it I need this compensation is because mine and my family's stability is more important to me than anything else. The compensation would be able to get me and my family multiple months rent, so we could save up with our current jobs, and other necessities needed at this time of homelessness for us. Let me know your opinion as soon as possible please. It's dire.

There is no evidence a settlement was ever reached or that the settlement offer was ever communicated to Fairless or his attorneys.

The criminal information against Fairless was amended multiple times between March 2022 and April 2024 when he was ultimately charged with three counts of rape. The

---

[4]At certain times below, the parties claimed the text message was sent to the Arkansas State Police investigator. At other times they claimed the message was texted to the DHS attorney handling the child-maltreatment action. In their appellate briefs, the parties state that the text message was between MV and the state police investigator. No clarifying evidence from either the investigator or the DHS attorney was presented.

first count alleged that Fairless engaged in deviate sexual activity with MV between August 1, 2011, and March 19, 2014, while MV was under the age of fourteen. The second and third counts alleged that between August 1, 2013, and May 31, 2014, and between March 20, 2014, and November 30, 2016, Fairless, while MV's guardian, engaged in sexual intercourse or deviate sexual activity with her.

Before trial, the parties filed several motions in limine. Fairless's motion requested that all evidence related to the child-maltreatment proceedings be prohibited as well as any administrative findings from Arkansas, Oklahoma, or Texas. The State then filed a motion seeking, in part, to prohibit any evidence that Oklahoma or Arkansas had declined to prosecute Fairless for the same or similar conduct. The court granted both motions.

The State also filed a motion in limine seeking to prohibit Fairless from introducing evidence that MV had inquired into her options for a civil settlement, claiming that such evidence would be prejudicial and because there was no evidence that MV had offered to drop the current charges or recant her allegations in exchange for a cash settlement. In a hearing on this motion, the State explained that MV thought the DHS attorney who was involved in the child-maltreatment appeal was her attorney, and MV asked the attorney, in a text message, whether they could reach a settlement. The prosecuting attorney indicated she was not aware of MV having filed a civil suit and argued that allowing the introduction of the text message would be misleading to the jury because they "might infer she intended to have the defendant pay her not to file charges . . . or something of that nature." She argued that to admit this evidence would be irrelevant and extremely prejudicial to the State.

4

Relying on *Wilson v. State*, 289 Ark. 141, 712 S.W.2d 654 (1986), defense counsel responded that to exclude this evidence would be reversible error. He pointed out that MV had reached out to "a state attorney who did not represent her," proposing to settle this case for $15,000. The court responded that "this case cannot be settled," to which defense counsel replied, "No. But proposing to settle out with him for a cash value; proposing that he pay her 15,000 bucks and that she be done with all of this stuff." The State countered that the defense was mischaracterizing the conversation and that "there was no mention of [MV] dropping charges or ending the Child Maltreatment Registry case or anything like that. [MV] was seeking to be compensated for her injuries because she gave up. She believed no one would believe her. . . . Certainly if she'd gone to the Defense and said, 'If you give me $15,000, I'll tell the prosecutor to drop the charges,' That's not what happened." Then this exchange took place.

COURT: So what is it you want to do?

DEFENSE: So this case [*Wilson v. State*] actually says even if she talked to her own lawyer about that, and had she asked a private lawyer to try to resolve these issues for monetary value, is what that case stands for, is I'm allowed to ask her that question if she sought monetary compensation out of this case. That's what the Wilson case says. It was actually a case where the judge denied them to ask that question. It was reversed on that sole issue.

COURT: What kind of case was it that they were talking about in that case? Was it an actual civil lawsuit that she filed against the defendant?

DEFENSE: No, I think she filed civil case or was going to file a civil case in that case. In this case, I assume the statute of limitations had already ran in this case before she proposed to settle it for cash.

COURT: But then how's it relevant if she didn't even have the ability to file a case? This is not filing a case, is that correct? What she did was not filing a case?

DEFENSE: No, she did not. I agree. She did not file an actual civil case.

COURT: So you want to ask her, did you consider getting monetary compensation from him for the acts he committed?

DEFENSE: Correct.

COURT: That's what you want to ask?

DEFENSE: Absolutely. I think it goes to show bias.

The prosecuting attorney reminded the court that these charges were not filed until years after the text was sent. The court then confirmed its understanding that MV had, in fact, not hired an attorney, that MV did not file a civil suit, and that the text was a conversation between MV and a DHS attorney who had no power to bring charges. Ultimately, the court withheld ruling on the motion and stated,

> [D]epending on how the testimony of [MV] comes out, before you ask any questions about that, we need to discuss this at the bar because I don't know what she's going to say; I don't know what the context of these conversations that you say she had were. This was years before the case was filed.

At trial, MV testified that Fairless had sexually abused her from the time she was eight or nine years old. Although she could not pinpoint the dates when the abuse occurred, she gave detailed descriptions of what happened and where the abuse occurred. When she was about sixteen years old, she disclosed the abuse to a classmate, Griselda Salinas. She later disclosed it to some other friends who convinced her to tell her mother.

The State then asked whether MV had ever considered a civil lawsuit against Fairless.

The discussion proceeded as follows:

STATE:  [MV], do you know what a civil lawsuit is?

MV:  Partially, I guess. Not really. I don't know much about that stuff.

STATE:  Vaguely?

MV:  Vaguely.

STATE:  Do you think you've ever filed a civil lawsuit against Kyle?

MV:  No.

STATE:  Have you ever hired an attorney to sue him?

MV:  No. I've had too much going on in my life. I don't even – the main reason I'm doing this is so I can make sure there ain't no other kid that's going to get hurt.

STATE:  Have you ever given him an offer to give you money in exchange for dropping these charges?

MV:  No.

STATE:  Was there a time when you asked an attorney about the possibility of a civil settlement?

MV:  In a moment of weakness, right after I got out of Brentwood, which is a psychiatric hospital, because I tried killing myself.

STATE:  How old were you?

MV:  And I didn't want to go to court. I was 19. And I didn't want to go to court, and I was scared, but I needed – I didn't know how it all worked, and you only see[] things, what you see. And then I just figured that's some sort of recognition, some sort of closure. I don't know. And it was a moment of weakness. But I don't care about that.

STATE:      So you asked an attorney that was involved in something else?

MV:         I had even forgotten about it until it got brought up to me again.

STATE:      And after that happened –

MV:         And if I'm being honest.

STATE:      -- did you proceed with that plan at all?

MV:         No, I'd forgot. I didn't care.

STATE:      Do you want any money for –

MV:         I just wanted him away from kids.

STATE:      You want him what?

MV:         I just wanted him away from kids.

STATE:      Do you want anything from him? Do you plan to get anything from him? In fact, the statute of limitations has run, hasn't it? You can't even file a lawsuit?

MV:         If it has? I don't even care. I just want him away from kids.

On cross-examination, Fairless's counsel attempted to question MV further.

DEFENSE:    Okay. Now, there was some conversation earlier. I want to make sure I'm clear on this. [The State] was asking you some questions about you asking for some money. Do you remember that?

MV:         Yes.

DEFENSE:    In fact, the truth is that you solicited or propositioned [the state police investigator] to try to get Kyle and his attorneys to meet with you to try to get this case dismissed?

This question drew an objection from the State on the grounds that defense counsel had misrepresented her testimony since there were no criminal charges pending at that time.

Defense counsel stated that it would rephrase the question and stated that he wanted to impeach MV with the $15,000 settlement offer. In doing so, defense counsel referenced MV's text message that had been the subject of the motion in limine. The court noted that there was no foundation for the text message and that the charges in this case had not been filed when the text message was sent and referenced matters the jury was not privy to, including a separate case. After extensive argument over the admissibility of the text message, the court held that defense counsel could ask MV if she had ever made an offer to take money and could ask how much it was. The questioning then continued:

DEFENSE:     Do you remember making an offer to take $15,000 from Kyle Fairless?

MV:          Are you taking about what [the State] was questioning me on earlier?

DEFENSE:     Yes.

MV:          Yeah. As I said before, it was a moment of weakness, and I had no idea what to do. Everything, I felt, was being pushed off, and I needed some form of justice. I had just gotten out of the psychiatric unit.

DEFENSE:     I just want to make sure though that you agree that that was the amount that you asked to take –

MV:          I don't remember the amount, if I'm being honest. I don't. If that's the question you're asking from [the State] earlier, then I already gave you my answer earlier, but I'll give it to you again. Yes. It was a moment of weakness.

DEFENSE:     Okay.

MV:          I tried killing myself a couple of weeks prior because that hearing was coming up.

9

After MV's testimony, the State called several other witnesses, including MV's sibling Codey Thomas; her grandmother, Linda Thomas; her friend Griselda Salinas; and her mother, Amanda Whitaker. Linda, Codey, and Amanda each testified as to their observations of MV's interactions with Fairless and her changing demeanor. Amanda also testified regarding MV's eventual disclosure, as did Griselda.

When questioning Amanda about MV's disclosure, the State asked about MV's demeanor during the disclosure. She responded that MV was crying and that MV could "barely breathe" and was "panicked." The State then asked her how she felt when MV disclosed the abuse to her, at which point the defense objected on relevance grounds. The court overruled the objection. Amanda explained that "[i]t was a nightmare." She testified she felt "[a]bsolutely uncontrolled and helpless. . . . very, helpless, and scared and angry." She then stated that she was in shock and that after MV disclosed the abuse, she went directly to the police station without going home or contacting her husband first.

In addition to those fact witnesses, the State presented the testimony of Brandi Cannon, the supervisor of clinical services at the Cooper Anthony Mercy Child Advocacy Center who interviewed MV; and Breta Bean, a sexual-assault nurse examiner. Cannon testified regarding delayed disclosures and grooming behaviors. Bean testified regarding female anatomy and why there may not be physical findings of abuse in cases of delayed disclosure.

After the State presented its case, Fairless testified in his own defense and denied sexually abusing MV. The jury, after considering the evidence and hearing the arguments of

counsel, acquitted Fairless on the first two counts of rape but convicted on the third. Fairless now appeals that conviction, arguing that the circuit court erred in restricting his ability to impeach MV's testimony with evidence of an attempted settlement and in allowing MV's mother to testify regarding her emotional reaction to MV's disclosure.

## II. *Analysis*

Both issues before us involve the circuit court's decisions on evidentiary issues. Evidentiary rulings lie within the broad discretion of the circuit court, and we will not reverse absent a manifest abuse of discretion, and then only if the defendant was prejudiced. *De la Garza v. State*, 2025 Ark. 10, at 8, 704 S.W.3d 627, 633; *Bragg v. State*, 2023 Ark. 66, at 7, 663 S.W.3d 375, 380; *Bishop v. State*, 2023 Ark. 150, at 10, 675 S.W.3d 869, 876. "Abuse of discretion is a high threshold that does not simply require error in the circuit court's decision, but requires that the circuit court act improvidently, thoughtlessly, or without due consideration." *De la Garza*, 2025 Ark. 10, at 8, 704 S.W.3d at 633. With this in mind, we address each issue in turn.

## A. Impeachment

Fairless first argues that the circuit court erred in restricting his ability to cross-examine MV as to whether she was willing to forgo pursuit of a future criminal action in exchange for $15,000. He contends this was prejudicial because it restricted the jury's ability to weigh bias, interest, motive, and credibility and that there was a reasonable possibility that the jury might have also acquitted on the third count if this line of inquiry had been fully and properly permitted. We disagree.

We begin by noting that our supreme court has stressed the importance of allowing wide latitude with respect to the admission of evidence relevant to the bias of the witness. *Edison v. State*, 2015 Ark. 376, 472 S.W.3d 474. Moreover, a pecuniary interest may always be shown to discredit a witness. *Wilson v. State*, 289 Ark. 141, 712 S.W.2d 654 (1986); *Wright v. State*, 133 Ark. 16, 201 S.W. 1107 (1918). However, such latitude is not endless. In *Edison*, our supreme court discussed the limits of such testimony:

> Merely because one is allowed wide latitude to inquire as to bias does not mean that one is permitted to do so without limit. To the contrary, once the main circumstances showing bias have been admitted, a circuit court does have the discretion to determine how far the examiner may delve into the details. *See Billett v. State*, 317 Ark. 346, 877 S.W.2d 913 (1994). When the evidence reaches this posture, the circuit court may impose reasonable limits on cross-examination based on concerns about harassment, prejudice, waste of time, unnecessary duplication of testimony, confusion of issues, or interrogation that is repetitive or only marginally relevant. *See Gilcrease v. State*, 2009 Ark. 298, 318 S.W.3d 70; *Newman v. State*, 327 Ark. 339, 939 S.W.2d 811 (1997). The circuit court's discretion to limit these details will not be reversed absent a showing of abuse. *See Billett*, 317 Ark. 346, 877 S.W.2d 913.

*Edison*, 2015 Ark. 376, at 5–6, 472 S.W.3d at 477.

Here, during its direct examination, the State questioned MV regarding her attempt at settlement. In that exchange, MV denied ever offering to drop "these charges" in exchange for money and admitted there was a time when she asked an attorney about the possibility of a civil settlement. Following up on this issue during cross-examination, defense counsel asked MV if she had "solicited or propositioned" the state police investigator in an effort to get Fairless and his counsel to meet with her in order to get the charges against Fairless dismissed. The State objected to counsel's mischaracterization of MV's testimony and reminded him of the court's prior ruling. A lengthy bench conference ensued. Defense

counsel said he would "clean up the question" and then asked to introduce evidence of what

MV stated in her text message. The court rejected his request for multiple reasons, including

the fact that the text message had not been properly authenticated[5] and that its introduction

might lead to confusion or the introduction of inadmissible evidence given that at the time

of the message, Fairless had not been charged in the instant case, he had been investigated

by other jurisdictions on related charges, and his appeal of his placement on the Child

Maltreatment Registry was ongoing. The court ultimately limited counsel's questioning to

whether MV had sought $15,000 from Fairless. In doing so, the court imposed reasonable

limits on cross-examination duly considering Fairless's right to discredit the witness with

evidence of pecuniary interest and also considering the danger of potentially divulging

inadmissible, confusing, and highly prejudicial evidence to the jury. We cannot say this

reasoned response was an abuse of discretion.

Fairless relies on *Hopkins v. State*, 2017 Ark. App. 273, 522 S.W.3d 142, and *Wilson*,

*supra*, for the proposition that the circuit court committed reversible error in restricting his

ability to inquire into MV's pecuniary interests. However, we agree with the State that

*Hopkins* and *Wilson* are distinguishable because they both involved the complete restriction

of such inquiry. This case is more in line with *Edison*, *supra*, where the court allowed the

inquiry and simply imposed reasonable restrictions on it.

---

[5]Given the fact that it is unclear from the record whether the text message was sent to the state police investigator or to an attorney, this was a legitimate concern.

Finally, we are not convinced that the circuit court did not allow Fairless to introduce exactly what he requested. At the hearing on the motion in limine, defense counsel indicated he wanted to ask MV whether she had considered getting monetary compensation from Fairless for the acts he committed. At trial, MV was asked if she made an offer to take $15,000 from Fairless, and she agreed that she had. She also testified that she had asked an attorney about the possibility of a civil settlement because she did not want to go to court and that she wanted some sort of recognition or closure. Thus, there was enough evidence presented for the jury to infer that MV made the offer in order to obtain monetary compensation from Fairless for what he had done to her—exactly what defense counsel was seeking to introduce.

## B. Emotional Reaction

Fairless next argues that the circuit court erred in permitting MV's mother, Amanda, to testify regarding her emotional reaction to MV's disclosure. He claims that her reaction was not relevant since it had no tendency to make the allegations against Fairless more or less probable and because it served to bolster MV's credibility. The admission of this testimony is not reversible error.

First, to the extent Fairless argues that Amanda's testimony improperly bolstered MV's credibility, that argument is not preserved for appeal. At trial, Fairless argued only that the testimony was irrelevant and was an attempt to elicit emotion from the jury. He did not argue, as he does now, that such testimony improperly bolstered MV's credibility. It is axiomatic that in order to preserve an argument for appellate review, a party must raise it at

14

trial, *see Gilliland v. State*, 2010 Ark. 135, 361 S.W.3d 279, and that arguments not raised at trial will not be addressed for the first time on appeal. *Plessy v. State*, 2012 Ark. App. 74, 388 S.W.3d 509. Moreover, parties are limited by the scope of their arguments and objections raised before the circuit court and cannot change the grounds for objection on appeal. *Parnell v. State*, 2025 Ark. App. 417. Because Fairless did not make this argument before the circuit court, we hold that it is not preserved for appellate review.

Nor do we hold that the admission of Amanda's emotional reaction to MV's disclosure amounted to reversible error under the facts as presented in this case because there has been no showing of prejudice. The jurors, at the close of the evidence were instructed that they were not required to set aside their common knowledge and could consider all "evidence in light of [their] own observations and experiences in the affairs of life." Amanda simply testified that it was a nightmare and that she felt helpless, scared, and angry—all feelings the jury, using its common knowledge, would imagine a parent would feel when a child discloses such abuse and that would lead to the reporting of these allegations to the proper authorities.

Moreover, her statements, in light of all the other testimony presented to the jury in this particular case, were not so inflammatory or prejudicial that reversal would be required. In so holding, we note that Amanda's testimony was not specific to just the one count of rape for which Fairless was convicted—if her testimony was prejudicial as to one count, it was prejudicial as to all. The jury, however, acquitted Fairless on two of the three counts of rape; thus, the admission of the evidence was clearly not unduly prejudicial. As stated before, we

15

will not reverse a circuit court's evidentiary ruling absent a showing of prejudice. *Camp v. State*, 2025 Ark. App. 404.

For the foregoing reasons, we affirm.

Affirmed.

ABRAMSON and HIXSON, JJ., agree.

*Jeff Rosenzweig*, for appellant.

*Tim Griffin*, Att'y Gen., by: *A. Evangeline Bacon*, Ass't Att'y Gen., for appellee.